#28886-a-JMK
**2020 S.D. 4**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                         Plaintiff and Appellee,

    v.

CHANCE GLENN HARRUFF,                         Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
GREGORY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BOBBI J. RANK
Judge

* * * *

RALEIGH HANSMAN
CLINT SARGENT of
Meierhenry Sargent, LLP
Sioux Falls, South Dakota                         Attorneys for defendant
                                           and appellant.


JASON R. RAVNSBORG
Attorney General

QUINCY R. KJERSTAD
Assistant Attorney General
Pierre, South Dakota                         Attorneys for plaintiff
                                           and appellee.

* * * *

ARGUED
SEPTEMBER 30, 2019
OPINION FILED **01/29/20**

#28886

KERN, Justice

[¶1.] A jury found Chance Harruff guilty of second-degree murder (SDCL 22-16-7) for the death of Kristi Olson. The circuit court sentenced Harruff to life in prison. On appeal Harruff argues the court erred by admitting other acts testimony from three witnesses over Harruff's objection that the testimony was cumulative in violation of SDCL 19-19-403. He also contends that the court erred in denying his motion for judgment of acquittal arguing there was insufficient evidence to sustain the conviction. We affirm.

## Background

[¶2.] Kristi Olson was discovered unconscious in her Dallas, South Dakota home on June 1, 2017 at 7:00 a.m. by Samantha York, Kristi's eldest daughter.[1] York lived in a nearby home on the same property. She had called her mother several times that morning, but received no answer. York knew Kristi should have been awake because she planned to leave her home at 6:00 a.m. to drive to Sioux Falls to trade in her truck. When York received no answer, she began to worry, so she walked over to her mother's house and noticed the truck still in the driveway. She entered Kristi's home through the front door, which she unlocked, and went downstairs to Kristi's room. There, she found Kristi lying in bed, unresponsive. York frantically called 911 and woke up everyone in the home.

[¶3.] Layne Olson, Kristi's eldest son, moved Kristi from her bed into the living room and placed her on the floor to perform CPR. Kristi's mother, Gay Lynn

---

1. Dallas is a small town in Gregory County located along route U.S. 18 about five miles west of Gregory.

-1-

Barry, and Layne performed CPR until an ambulance arrived at the home. When medical professionals arrived, they observed abrasions and discoloration around Kristi's neck. The ambulance transported Kristi to a hospital in Gregory. Shortly thereafter, doctors at the hospital pronounced her dead.

[¶4.] The Gregory County Sheriff's Office, with assistance from the South Dakota Division of Criminal Investigation, immediately began investigating Kristi's death. When Kristi's children noticed that their mother's cell phone was missing, they relayed that information to the officers. The children mentioned Chance Harruff, Kristi's most recent boyfriend, who was known for having a tumultuous relationship with Kristi and taking her cell phone. Law enforcement quickly identified Harruff as a person of interest.

[¶5.] Harruff and Kristi had a history of verbal arguments and physical altercations, but Kristi refused to report the domestic violence to law enforcement. However, Kristi did confide in family and friends about the various acts of physical abuse caused by Harruff and shared photos of her injuries. A major source of contention in their relationship centered around phone calls and text messages Kristi received from other men. Kristi assigned separate ringtones to text messages and calls received from her former boyfriends. When Harruff heard the sound of these ringtones, he knew that other men were contacting Kristi and the couple would fight. On several occasions during their arguments, Harruff destroyed her cell phones.

[¶6.] Several hours after York discovered Kristi's body, law enforcement asked Harruff to come in for questioning, and he did so voluntarily. During his first

interview, Harruff provided the officers with an account of his whereabouts on the previous day. Harruff told the officers he spent the day with Kristi in Sioux Falls helping her purchase a new truck. The two returned to Kristi's home in Dallas in the evening and had supper with her family. Harruff told officers that the last time he saw Kristi was around 6:00 p.m. when he left her house. According to Harruff, he went to Mr. G's Convenience Store in Gregory, talked with a friend who worked there, Kristin Wallace, and then went to his apartment. After Wallace finished work, she came to Harruff's apartment for a few beers. Around 12:30 a.m., Harruff and Wallace stepped out to get cigarettes. They returned to the apartment, and Wallace stayed about 20 minutes before leaving. Harruff told the officers he stayed home for the rest of the night.

[¶7.]        Harruff further explained that after receiving numerous text messages from Kristi, he decided to call her at 2:45 a.m. The conversation was about their relationship and the texts she received from other men, but was not an argument. Harruff ended the call so that he could talk with his new girlfriend in Colorado on and off until morning. When asked, Harruff denied driving to Dallas or leaving his apartment. Officers questioned Harruff about Kristi's missing cell phone. He informed the officers that he did not know where it was, but that Kristi must have had it since she spoke on it and texted him well into the night. Harruff claimed the last time he saw the phone it was in Kristi's possession when he left her home for the evening.

[¶8.]        Officers contacted Kristi's cell phone provider for the last known information on her cell phone and discovered that a ping was emitted from the

phone, somewhere between Dallas and Gregory, around 4:00 a.m. A review of surveillance videos from various businesses in Gregory around that time frame revealed further evidence of Harruff's whereabouts. Footage from Mr. G's Convenience Store showed Harruff's car driving into Gregory from the east and parking near the dumpster at Mr. G's. Harruff briefly got out of his vehicle and then drove in the direction of his apartment. Officers searched the dumpster and found a broken purple iPhone in a white kitchen trash bag. Witnesses identified the phone as Kristi's cell phone.

[¶9.] Later that evening, officers interviewed Harruff a second time to confront him with the cell phone information. After giving several conflicting explanations, Harruff admitted that he traveled to Kristi's home around 4:00 a.m. just to "see who was at the house." Kristi's home had a walkout basement and her bedroom was on the lower level just beyond the living room. Harruff said that he went to the door facing east on the lower level and spoke with her at the doorway. While they were talking at the walk-out basement door, Kristi's phone received a text message from one of her male friends. The two had a verbal disagreement about the message, and he grabbed her cell phone out of her hand. Harruff claimed that Kristi hit him and in response, he shoved her in the chest with the heel of his hand "pretty hard." The punch knocked her back two steps, and she landed on a knee.

[¶10.] He told the officers that he didn't intend to hit her that hard, but he was known for his unique ability to strike hard punches with the strength of a mule kick, so much so that his former boxing coaches nicknamed him "The Mule."

Harruff claimed Kristi got up, slammed the door in his face and locked it, so he drove back towards his home. When he arrived in Gregory, he tossed Kristi's phone in the dumpster at Mr. G's and went home. Harruff claimed that he never entered Kristi's home during the confrontation, remaining only in the doorway, and that she was alive when he left.

[¶11.]     At the State's request, Dr. Kenneth Snell performed an autopsy on Kristi's body. He concluded that the cause of Kristi's death was asphyxia due to manual strangulation and that her death was a homicide. A Gregory County grand jury indicted Harruff for alternative counts of first-degree murder, second-degree murder, and first-degree manslaughter.

[¶12.]     During an eight-day jury trial, sixteen witnesses testified for the State, including DCI Agents, EMTs, medical professionals, forensic pathologists, and several of Kristi's relatives and friends. The testimony of Gay Lynn Barry and Samantha York focused on the events of June 1, and the conflicts between Kristi and Harruff that occurred during their relationship. Additionally, Kristi's friends Marissa Bridges, Kristin Wallace, and Melvin Vosika testified regarding other acts of domestic abuse, including Kristi's statements describing her relationship with Harruff. At the close of the State's case-in-chief, Harruff moved for judgment of acquittal. The circuit court denied the motion. Harruff called one witness in his defense, a forensic pathologist, who testified that Kristi's death did not appear to be caused by strangulation, but instead could have resulted from her preexisting medical conditions.

[¶13.]     The jury found Harruff guilty of second-degree murder in violation of SDCL 22-16-7.  After the trial, Harruff renewed his motion for a judgment of acquittal, which the circuit court denied.  The court sentenced Harruff to life in prison.  On appeal, Harruff raises two issues which we restate as follows:

> 1.     Whether the circuit court abused its discretion by admitting the testimony of Wallace, Bridges, and Vosika in violation of SDCL 19-19-403.
>
> 2.     Whether the circuit court erred in denying Harruff's motion for judgment of acquittal.

**Standard of Review**

[¶14.]     Evidentiary rulings are reviewed for abuse of discretion.  *State v. Stone*, 2019 S.D. 18, ¶ 22, 925 N.W.2d 488, 497.  An abuse of discretion is "a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration is arbitrary or unreasonable."  *State v. Kvasnicka*, 2013 S.D. 25, ¶ 17, 829 N.W.2d 123, 127–28 (quoting *State v. Lemler*, 2009 S.D. 86, ¶ 40, 774 N.W.2d 272, 286).  Under the abuse of discretion standard, "not only must error be demonstrated, but it must also be shown to be prejudicial."  *Stone*, 2019 S.D. 18, ¶ 22, 925 N.W.2d at 497 (quoting *State v. Bausch*, 2017 S.D. 1, ¶ 12, 889 N.W.2d 404, 408).

[¶15.]     The denial of a motion for judgment of acquittal is a question of law we review de novo.  *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83.  The standard is "whether the evidence was sufficient to sustain a conviction."  *State v. Klaudt*, 2009 S.D. 71, ¶ 14, 772 N.W.2d 117, 122 (quoting *State v. Tofani*, 2006 S.D. 63, ¶ 24, 719 N.W.2d 391, 398).  When measuring the sufficiency of the evidence, "we ask 'whether, after viewing the evidence in the light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* "We accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." *Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d at 83 (quoting *State v. Jensen*, 2007 S.D. 76, ¶ 7, 737 N.W.2d 285, 288). "This Court will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence." *Id.*

## Analysis

1. *Whether the circuit court abused its discretion by admitting the testimony of Wallace, Bridges, and Vosika in violation of SDCL 19-19-403.*

[¶16.] Harruff acknowledged at the beginning of the trial that his relationship with Kristi was a "volatile one," and that both parties struck each other during verbal arguments. He does not contend that the "other acts testimony" provided by Wallace, Bridges, and Vosika about Kristi's reports of domestic abuse standing alone was unfairly prejudicial. Rather, Harruff argues that the testimony was needlessly cumulative to the testimony of Barry and York, and that the circuit court admitted other acts evidence in such quantity that it rose to the level of character evidence prohibited by SDCL 19-19-404(a).[2]

[¶17.] Pursuant to SDCL 19-19-403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The rule "favors the

---

2. "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." SDCL 19-19-404(a).

admission of evidence in the absence of strong considerations to the contrary." *State v. Wright*, 1999 S.D. 50, ¶ 15, 593 N.W.2d 792, 799 (citation omitted).[3]

[¶18.]     Prior to trial, the parties sought various pretrial rulings regarding the admissibility of several types of evidence. Principal to many of the State's pre-trial motions was its request that the circuit court admit evidence concerning Kristi's and Harruff's tumultuous domestic relationship. As part of this strategy, the State moved the court to admit statements which contained a detailed list of Kristi's conversations with relatives, medical professionals, and friends. It also filed a notice of intent to introduce other acts evidence under SDCL 19-19-404(b). Harruff filed a motion to exclude other acts evidence pursuant to Rule 404(b).

[¶19.]     The circuit court held a hearing to consider these motions. It explained that it would first rule on the other acts evidence and the domestic relationship and then address the admissibility of Kristi's statements under the confrontation clause and the various hearsay exceptions. The court observed that the State had essentially offered the entire domestic relationship between Harruff

---

3.     Similarly, Rule 404(b) is a rule of "inclusion, not exclusion." *State v. Huber*, 2010 S.D. 63, ¶ 56, 789 N.W.2d 283, 301 (quoting *State v. Janklow*, 2005 S.D. 25, ¶ 33, 693 N.W.2d 685, 697). Evidence of other acts is permissible "when appropriate to prove some fact other than character." *State v. Laible*, 1999 S.D. 58, ¶ 20, 594 N.W.2d 328, 335. Evidence may be admissible to prove "motive, opportunity, intent, . . . identity, absence of mistake, or lack of accident." SDCL 19-19-404(b)(2). "To determine the admissibility of other acts evidence, the court must determine: (1) whether the intended purpose is relevant to some material issue in the case, and (2) whether the probative value of the evidence is substantially outweighed by its prejudicial effect." *Huber*, 2010 S.D. 63, ¶ 56, 789 N.W.2d at 301 (quoting *Janklow*, 2005 S.D. 25, ¶ 34, 693 N.W.2d at 697). Once the court finds the evidence relevant, "the balance tips emphatically in favor of admission[.]" *Id.* ¶ 59, 789 N.W.2d at 302 (quoting *Janklow*, 2005 S.D. 25 ¶ 34, 693 N.W.2d at 698).

and Kristi as other acts evidence in addition to a series of specific instances of physical abuse. The court, in reviewing this evidence, described the relationship as "controlling and hostile," fueled by Harruff's "jealousy of Olson's relationships with other men." This animosity triggered a cycle of domestic violence involving "fighting and arguing, having make-up sex, then fighting and arguing all over again; the fact that Kristi Olson would slap Harruff, he would slap her back."

[¶20.] The circuit court then methodically examined the proffered evidence. It found much of the evidence concerning the domestic relationship, including the specific acts of abuse, probative and highly relevant to show the state of mind of both Kristi and Harruff. The evidence was also relevant to prove Harruff's motive, intent, identity, and modus operandi. After conducting the requisite balancing test, the court admitted portions of the State's other acts evidence, concluding that "the concerns of unfair prejudice or confusion [did not] substantially outweigh the probative value."

[¶21.] The circuit court held a second hearing to consider the proffered testimony of Bridges, Barry, and York regarding the statements Kristi made to them. Following the hearing, the court issued detailed findings of fact and conclusions of law admitting certain statements of the decedent victim. In this process the court carefully weighed the proffered testimony and again excluded a number of statements and items of evidence under SDCL 19-19-403.

[¶22.] The circuit court also granted portions of Harruff's 404(b) motion precluding the State from needlessly referencing at trial a number of designated acts. In its order, the court held in abeyance until trial any ruling on Harruff's

objection that some of the offered testimony was cumulative. The court also indicated that it would give the jury an appropriate limiting instruction regarding the appropriate weight to give the other acts evidence.

[¶23.] Review of Harruff's argument that the testimony of Bridges, Wallace, and Vosika was cumulative to that of Barry and York, requires analysis of their trial testimony. We begin, as the circuit court did, with the other acts evidence admitted through Barry. Barry testified about several text messages Kristi sent detailing various accounts of physical abuse by Harruff. In one incident that occurred in September 2016, Kristi told Barry she was bathing her daughters in the bathtub when Harruff threw her phone. She stated that she slapped him in response, and Harruff then hit her. Barry also testified about a text message in which Kristi described Harruff's tendency to take her phones, stating, "He's broken four phones in a month." In another text, Kristi told Barry that her youngest daughter did not "want to go to sleep because she says what if he kills you."

[¶24.] Barry testified about other text messages where Kristi said Harruff was unstable when he was drinking and that she was afraid of him. In one such message, Kristi suggested having a code word she could text to Barry in case she needed Barry to call the police for her. Within the same conversation, Kristi asked Barry to buy a baby monitor that she could put in her room to summon help if needed. Following Barry's testimony, the circuit court gave the jury a limiting instruction informing the jury that they could only consider the evidence to determine Harruff's intent, motive, identity and modus operandi.

[¶25.] The State called York next. She, like Barry, testified about several text message conversations she exchanged with Kristi regarding Harruff's physical abuse. Kristi also texted York about the incident where Harruff hit Kristi while she was bathing her daughters in the bathtub. During her conversation with York, Kristi sent her a picture of her face stating, "This is what Chance just did to me." When York asked additional questions about the incident, Kristi said, "He hit me hard . . . I think just a slap but I still can't feel my face or hear out that side." With this foundation, the photo was introduced into evidence.

[¶26.] York also testified about a time when Kristi was hospitalized in Sioux Falls in October 2016 and asked her to come to her hospital room right away. After she arrived, York learned that hospital staff had escorted Harruff out of the building because he slapped Kristi. York also described Kristi's report of an incident of abuse that had occurred during Christmas 2016. Kristi told York that she received a text message from an ex-husband wishing her Merry Christmas. This upset Harruff, and Kristi woke up to Harruff choking her. He then took her phone. Eventually Kristi's children discovered the burnt remnants of her phone in the wood stove in the house.

[¶27.] York testified about taking Kristi to the hospital on another occasion because Kristi was feeling ill and believed Harruff was drugging her. The toxicology report from the hospital revealed that Kristi had methadone in her system. York testified that she was not aware of any prescription her mother had for methadone. Following York's testimony, the circuit court again read the

cautionary instruction to the jury advising them of the proper way to consider the other acts evidence.

[¶28.] As the trial progressed, Harruff reiterated his objections to duplicitous and cumulative testimony. The State notified the court of its plan to call Erin Cole to offer other acts testimony involving Facebook messages she received from Kristi. Because Cole did not testify at the pretrial hearings, the State proffered her testimony for the circuit court's consideration during a recess. The court excluded the evidence, finding that Cole's testimony was hearsay not within any exception and cumulative to other evidence already received into evidence.

[¶29.] On the fifth day of trial, the circuit court permitted the State to elicit the testimony of Wallace, Bridges, and Vosika. In addition to Wallace's testimony about her interactions with Harruff on the night of May 31 and the early morning hours of June 1, Wallace testified that a few weeks prior to her death, Kristi contacted Wallace and asked to talk to her. Wallace joined Kristi on her mail route where Kristi confided in her about her relationship with Harruff, how she was scared and worried, and that she believed Harruff was drugging her.

[¶30.] When Bridges took the stand, she explained to the jury that she was living in an upstairs bedroom in Kristi's house. On one occasion, Kristi asked her whether she could hear Kristi screaming for help in the basement during her arguments with Harruff. Kristi told Bridges that Harruff had banged her head against a door and that she had called for help, but there was no response. Bridges testified that in April 2017, she put a baby monitor in Kristi's room so that she could hear Kristi if she yelled for help. A month later, while she was in Kristi's

room, Bridges noticed that the monitor was unplugged. Other than Harruff, Bridges was also the last person to see Kristi alive on the evening of May 31. Bridges testified that she stopped by Kristi's bedroom around 11:00 p.m. According to Bridges, Kristi was calm and watching TV.

[¶31.] Vosika told the jury that he and Kristi were long-term friends and that she confided in him about the ongoing physical abuse she suffered from Harruff. According to Vosika, Kristi was afraid to call law enforcement because she said that if Harruff got out of jail, he would kill her. Vosika explained that Harruff would shove, choke, and beat her until he got his way. Vosika testified that, one night, Kristi could not go to a movie because she was arguing with Harruff. Kristi stated she didn't want to set off Harruff and couldn't "take the physical anymore." Vosika asked if Harruff was hitting Kristi and she said yes, but she would deal with it. Later that evening, Vosika and Kristi ended up going to the movie. While there, Kristi stated she wanted Harruff gone, but didn't know how to get him to leave.

[¶32.] Following the testimony of Wallace, Bridges, and Vosika, the circuit court again gave the jury a limiting instruction. Prior to closing argument, as an additional precaution, the court advised counsel that although it gave the limiting instructions three times during the trial, they were not to argue in closing that this instruction was more significant or should be given greater weight than any other instruction.

[¶33.] Despite the cautionary instructions, Harruff contends the circuit court erred by allowing the testimony. The party objecting "to the admission of the other acts evidence bears 'the burden of establishing that the trial concerns expressed in

[SDCL 19-19-403] substantially outweighs the probative value of the evidence.'" *Huber*, 2010 S.D. 63, ¶ 59, 789 N.W.2d at 302 (quoting *Janklow*, 2005 S.D. 25, ¶ 38, 693 N.W.2d at 698). The party must show that "in all probability [the evidence] must have produced some affect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *Id.* ¶ 37, 789 N.W.2d at 295 (quoting *State v. Michalek*, 407 N.W.2d 815, 818 (S.D. 1987)).

[¶34.]     In *Huber*, we addressed a similar argument that the circuit court erred by admitting other acts evidence that was substantially more prejudicial than probative in violation of Rule 403. 2010 S.D. 63, ¶ 60, 789 N.W.2d at 303. Huber, who was tried for the shooting death of his wife, alleged that a number of evidentiary errors occurred at his trial, including the admission of approximately fifty of the decedent's out-of-court statements, which he alleged unfairly prejudiced him. These statements described, in part, the abusive nature of their marital relationship. *Id.* ¶ 57, 789 N.W.2d at 301.

[¶35.]     Although we reversed and remanded for a new trial on other grounds, we affirmed the admission of the statements, noting that "evidence of past abusive conduct in a domestic situation is highly relevant in murder cases." *Id.* This is because the jury is entitled to a complete picture of the parties' relationship. *Id.* The defendant is "certainly not entitled to have the jury decide his case on a pretense that his behavior and feelings toward the victim are nothing but routinely warm and affectionate." *Id.* (quoting *Laible*, 1999 S.D. 58, ¶ 23, 594 N.W.2d at 335).

[¶36.]　　　　Here, the testimonies of Wallace, Bridges, and Vosika were not needlessly cumulative, as they provided the jury with evidence of the nature of Kristi's and Harruff's relationship at different times and described varying incidents of abuse. The conversation with Wallace that occurred shortly before Kristi's death involved Kristi's ongoing fear of Harruff and her belief that Harruff was drugging her. Similarly, Bridges' testimony was relevant to explain that Kristi's screams for help went unheard, requiring Bridges to install a baby monitor following an incident where Harruff banged Kristi's head against a door. Vosika's testimony established that the abuse was ongoing, and that Kristi was afraid Harruff would kill her if she told law enforcement. It also explained Kristi's desire to handle the situation herself along with her wish that Harruff stay off the property.

[¶37.]　　　　Even if some fragments of the testimonies overlapped, they did not constitute evidence of character in violation of SDCL 19-19-404(a). While the testimony was damaging to Harruff's case, it was not unfairly so. "[E]vidence is not prejudicial 'merely because its legitimate probative force damages the defendant's case.'" *Huber*, 2010 S.D. 63, ¶ 54, 789 N.W.2d at 300 (quoting *State v. Bunger*, 2001 S.D. 116 ¶ 13, 633 N.W.2d 606, 610).

[¶38.]　　　　Based on our review of the record, it is apparent from the circuit court's careful evaluation of the evidence that it performed the requisite balancing tests required and excluded cumulative, prejudicial, and irrelevant evidence where appropriate. Additionally, the court gave an "appropriate, precisely tailored cautionary instruction" to the jury before admitting the other acts evidence and

cautioned counsel not to focus on this instruction in closing. *Id.* ¶ 60, 789 N.W.2d at 303. Harruff has failed to establish that the admission of the challenged testimony, in all probability, produced some affect upon the jury's verdict that was harmful to his substantial rights. *See id.* ¶ 37, 789 N.W.2d at 295. We cannot say that the circuit court abused its discretion in admitting the evidence.

> 2. *Whether the circuit court erred in denying Harruff's motion for judgment of acquittal based on the insufficiency of the evidence.*

[¶39.] Harruff was charged with murder in the second-degree in violation of SDCL 22-16-7 which provides:

> Homicide is murder in the second degree if perpetrated by any act imminently dangerous to others and evincing a depraved mind, without regard for human life, although without any premediated design to effect the death of any particular person, including an unborn child.

In order to successfully prosecute a suspect for murder under this statute, the prosecution must prove that the Defendant's conduct established that he was acting with a depraved mind. *State v. Primeaux*, 328 N.W.2d 256, 258 (S.D. 1982). This mens rea requirement involves less culpability than the element of premeditation required for first-degree murder. *State v. McCahren*, 2016 S.D. 34, ¶ 10, 878 N.W.2d 586, 592.

[¶40.] Harruff contends that the State's evidence at trial focused on his anger and jealousy in order to prove premeditation. Because the jury acquitted Harruff of first-degree murder he argues that the State failed to establish sufficient evidence to support the element of a depraved mind required for second-degree murder. In Harruff's view, he could be convicted of first-degree murder or first-degree

manslaughter, but nothing more. He argues that "second-degree murder is not and should not be a fall back option."[4]

[¶41.] We rejected a similar argument in *Laible*, where the State sought a first-degree murder conviction against the defendant for the shotgun slaying of the defendant's mother, but the jury returned a verdict of second-degree murder. 1999 S.D. 58, ¶ 11, 594 N.W.2d at 332. The defendant argued that the bulk of the evidence presented was offered to prove premeditation and therefore he was either guilty of first-degree murder or manslaughter, but could not be guilty of second-degree murder. *Id.* We held if "a person is able to act with 'a lack of regard for the life of another,' then that person can be convicted of second degree murder." *Id.* ¶ 13 (quoting *State v. Hart*, 1998 S.D. 93, ¶ 16, 584 N.W.2d 863, 866). After reviewing the evidence, the Court concluded there was sufficient evidence "to show that [the] defendant committed an imminently dangerous act evincing depravity of mind, without regard for human life." *Id.* ¶ 14, 594 N.W.2d at 333.

---

4.   Although Harruff does not specifically argue that the jury's verdict is inconsistent, he alludes to this idea when arguing that second-degree murder is not a fall back option. We previously addressed this issue in *State v. Mulligan*, holding that "a criminal defendant convicted by a jury on one count can not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count." 2007 S.D. 67, ¶ 11, 736 N.W.2d 808, 814 (quoting *United States v. Powell*, 469 U.S. 57, 58, 105 S. Ct. 471, 473, 83 L. Ed. 2d 461, 464 (1984)). Juries are not required to explain their decisions. *Id.* "Instead of speculating whether the inconsistent verdicts are evidence of jury error, appellate courts should review the sufficiency of the evidence to support the conviction that was rendered." *Id.* ¶ 12, 736 N.W.2d at 815. The jury's finding that Harruff was not guilty of first-degree murder cannot be used to support his argument that the evidence was insufficient to support a second-degree murder conviction.

[¶42.]     Here, the State offered evidence that Harruff acted with a lack of regard for the life of another by the act of strangulation.  We have previously observed that strangulation injuries indicate a deliberate use of force and that choking another involves an imminently dangerous act that may cause death.  *State v. Kryger*, 2018 S.D. 13, ¶ 49, 907 N.W.2d 800, 815.  Likewise, Harruff's admission that he struck Kristi in the chest with the force of a mule kick evinces a lack of regard for her life in this case.  Witnesses described Kristi as five-foot four-inches, weighing 138 pounds, her body weakened from years of stomach surgeries and ailments.  In contrast, Harruff at the time of the killing was six-feet two-inches and 250 pounds.  In sum, the evidence reflects that Harruff's actions showed indifference to human life and behavior evincing depravity.

[¶43.]     Alternatively, Harruff attacks the sufficiency of the evidence supporting his second-degree murder conviction.  We note, however, that the State offered an abundance of evidence of the verbally abusive and physically violent nature of the relationship between Kristi and Harruff.  As we have explained in detail above, several witnesses testified about numerous occasions where Harruff fought with Kristi and punched, slapped, pushed, and choked her.

[¶44.]     The State also presented substantial evidence of Harruff's guilt arising from his activities on the night in question.  Wallace testified that she was working at Mr. G's Convenience Store around 9:45 p.m. when Harruff came in to buy a 12-pack of beer.  According to Wallace, Harruff was visibly upset.  In fact, his anger was so overwhelming that he punched his hand and railed about an argument he had with Kristi earlier in the evening.  Wallace testified that after she got off work,

she went to his apartment to continue their discussion about Kristi. The two then went briefly to her nephew's home for cigarettes and returned to the apartment. When they returned, Harruff continued to talk about Kristi's conversations with other men and said that he was "f * * *ing done with her." Wallace saw Harruff drink four or five beers before she left the apartment.

[¶45.] Harruff's inconsistent statements to the police were also damaging to his case. During Harruff's first interview, he lied to the police about where he was that night. Instead of indicating that he went to Kristi's house, Harruff told them he never left his apartment. Despite Harruff's deception, the officers were able to independently piece together evidence of his movements that night. Harruff also attempted to cover his tracks by calling Kristi's phone around 7:00 a.m. even though he knew it could not be answered. During his second interview, Harruff continued to lie even after being told the police had found Kristi's phone. Eventually, he did admit going to Kristi's house and hitting her.

[¶46.] When York found Kristi's lifeless body, she had bruising around her neck. At trial, the State called Dr. Snell, the forensic pathologist who concluded that she died of asphyxia caused by manual strangulation. To explain his findings, Dr. Snell described the external and internal injuries to Kristi's neck. He testified that he observed abrasions on both sides of Kristi's neck with slightly curved abrasions on the right side consistent with the shape of a fingernail. Beneath the abrasions, Dr. Snell found fresh internal hemorrhages in the deep musculature of the neck consistent with having forceful pressure applied around the neck.

[¶47.]     Dr. Snell's examination of Kristi's face, eyes, lip, and upper portions of her neck revealed the presence of petechial hemorrhages, which are ruptures of small blood vessels due to increased pressure. The hemorrhages appeared only above the abrasions to the neck and not below, which suggests they were caused by pressure applied to Kristi's neck in the area of the abrasions. Dr. Snell testified that during strangulation, a person will become unconscious in approximately 10 to 15 seconds, and that death will occur after three to five minutes of continuous pressure.

[¶48.]     In addition to Harruff's admissions, the record contains strong direct and circumstantial evidence of guilt. Over the course of the eight-day trial, the jury considered the evidence presented which included the testimonies of the witnesses, text messages, photographs, the differing opinions of the parties' pathologists regarding the cause of Kristi's death, medical reports, and lab tests. In rendering its verdict, the jury performed its function by passing on the credibility of the witnesses, resolving any conflicts in the evidence, and weighing the evidence. *State v. Miller*, 2014 S.D. 49, ¶ 27, 851 N.W.2d 703, 709.

[¶49.]     After viewing the evidence in a light most favorable to the verdict, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Klaudt*, 2009 S.D. 71, ¶ 14, 772 N.W.2d at 122. Based on our review of the record, the evidence is sufficient to support the conviction of second-degree murder and the circuit court did not err by denying Harruff's motion for judgment of acquittal.

**Conclusion**

[¶50.]     The circuit court did not abuse its discretion by permitting the testimony of Wallace, Bridges, and Vosika.  Further, even if the testimony was cumulative to some degree, Harruff has failed to establish that the challenged evidence was unfairly prejudicial or that it affected the jury's verdict.  The evidence presented by the State was sufficient to sustain a conviction of second-degree murder.  We affirm.

[¶51.]     GILBERTSON, Chief Justice, and JENSEN and SALTER, Justices, and KNOFF, Circuit Court Judge, concur.

[¶52.]     KNOFF, Circuit Court Judge, sitting for DEVANEY, Justice, disqualified.