#28522-a-MES
**2020 S.D. 57**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,               Plaintiff and Appellee,

    v.

KEVIN ALLAN KRUEGER,                 Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JON R. ERICKSON
Retired Judge

\* \* \* \*

JASON R. RAVNSBORG
Attorney General

PATRICIA ARCHER
Assistant Attorney General
Pierre, South Dakota                 Attorneys for plaintiff
                                     and appellee.


KENNETH M. TSCHETTER of
Tschetter & Adams Law Office, P.C.
Sioux Falls, South Dakota            Attorneys for defendant
                                     and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
MARCH 17, 2020
OPINION FILED **10/21/20**

#28522

SALTER, Justice

[¶1.]     A Beadle County jury found Kevin Krueger guilty of first-degree murder, and the circuit court imposed a mandatory sentence of life in prison. Krueger raises several issues on appeal. We affirm.

## Background

[¶2.]     Law enforcement officers in Beadle County had been searching unsuccessfully for Keith Houck during late May and early June of 2016, for reasons unrelated to this case. On June 2, 2016, local resident Trent Jankord reported to Huron police that Houck was missing or had possibly been killed. Special Agent Brent Spencer of the South Dakota Division of Criminal Investigation (DCI) interviewed Jankord that day.

[¶3.]     Following the interview, Agent Spencer went to Houck's rural Huron residence. Spencer observed that neither Houck nor his vehicle or two dogs were home. He also noted a window of the residence was completely broken out. Spencer's attempts to reach Houck by phone were also unsuccessful as was a return trip to Houck's farm the following day. Later that evening, Spencer received information through the Huron Police Department that Houck had been killed, and his body was located at Kevin Krueger's farm near Cavour.

[¶4.]     The source of the information was Krueger himself who had gone unprompted to the home of Beadle County Deputy Sheriff Shane Ball and confessed to killing Houck. The visit was peculiar and occurred at approximately 8:00 p.m. on June 3 while Ball was off duty. Krueger was a passenger in a truck driven by his girlfriend, Bonnie Goehring. Ball was outside and went to meet the truck as it

-1-

drove up. He recognized Krueger and later testified at trial that he had asked the couple "what was up?"

[¶5.] Deputy Ball recalled that Goehring asked him if he had the phone number for the Beadle County Sheriff. When Ball told Goehring the sheriff was out of town, she gestured toward Krueger as if to suggest he had something to say. Ball testified that Krueger kept his head down and spoke quietly, asking Ball if he was looking for Houck. Ball responded that he believed local law enforcement officers had been looking for Houck recently. Krueger then told Ball, "[Houck] was dead." According to Ball, Krueger paused then stated, "[H]e was buried at my farm." Ball asked, "[W]hy is that?" and Krueger answered, "[B]ecause I hit him with a bat."

[¶6.] Deputy Ball testified that he called 911 and requested that an officer come to his home. During the brief time before the officer arrived, Ball stated that Krueger told him Houck "kept messing" with his family and he "had enough." Krueger was arrested and transported to the Beadle County Detention Center.

[¶7.] Agent Spencer's earlier efforts to locate Houck quickly turned into a homicide investigation. He sought and obtained several search warrants, including one for Krueger's farm. Officers executed the warrant in the early morning hours of June 4. Agent Spencer and Agent Neitzert located Houck's disfigured body under some tarps and tires at Krueger's farm.

[¶8.] Agent Spencer and other law enforcement officers searched Houck's residence. They located two empty gun boxes in a closet. One of the missing guns was quickly located inside a leather holster on the floor of Krueger's pickup truck. The second gun was turned over to Spencer approximately one year later by the

family of Jose Antonio Vega, who investigators determined early on was also complicit in Houck's death.

[¶9.]     Forensic pathologist Kenneth Snell, M.D., performed an autopsy and concluded that Houck's death was a homicide caused by blunt force injury to the head administered through two lethal blows.  Officers had discovered a baseball bat located near Houck's body that was marked with several stains.  The bat was sent to the South Dakota State Forensic Laboratory (state crime laboratory) for testing.

[¶10.]     Krueger was indicted by a Beadle County grand jury and charged with first-degree murder under the theory that he killed Houck with a premeditated design to effect his death.  *See* SDCL 22-16-4(1).  Vega was also charged with first-degree murder in connection with Houck's death in a separate indictment.  The cases were not consolidated.

[¶11.]     Krueger filed a motion for change of venue on March 24, 2017.[1] Attached to the motion were seven articles published in the local Huron newspaper.  Following a hearing, the circuit court denied the motion, but stated, "[W]e will take it up again after the Vega trial[,]" which was scheduled first.  Ultimately, however, Vega's case was not tried, and he instead pled guilty to first-degree manslaughter

---

1.     In connection with the motion to change venue, Krueger also sought, among other things, to exclude the press from the courthouse until the jury was empaneled and to prohibit news coverage of pretrial and voir dire proceedings.  The circuit court denied relief, and those rulings are not at issue here.

pursuant to a plea agreement with the State.[2] Krueger did not renew the motion for change of venue, and the circuit court did not revisit the issue on its own.

[¶12.]     Krueger's case was tried to a jury over the course of four days. During voir dire, Krueger's counsel questioned individual prospective jurors concerning their responses to a juror questionnaire sent out months earlier. In addition to general biographical information, the questionnaire sought responses regarding potential jurors' knowledge of the case and any opinions they may have formed, including their views about the fact that Vega had pled guilty. At the conclusion of voir dire, counsel for both parties passed the panel for cause and selected fourteen jurors, two of whom were later designated as alternates.

[¶13.]     The State called six witnesses at trial, including Dr. Snell who testified about his autopsy findings and his determination that both the right and left sides of Houck's skull had fractures that radiated forward. According to Dr. Snell, the fractures were traumatic injuries and were consistent with blows from a baseball bat. Dr. Snell also noted several other non-fatal contusions during Houck's autopsy that could have been caused by a baseball bat or by kicking.

[¶14.]     Amber Bell, a forensic scientist with the state crime laboratory, testified concerning the methods used in her DNA analysis of physical evidence, which included the bat recovered near Houck's body and black Velcro tennis shoes seized from Krueger. She explained that swabs taken from the barrel of the bat indicated a mixture of DNA from two individuals. The main contributor of the DNA

---

2.     The circuit court sentenced Vega to 50 years in prison.

was Houck, but the DNA testing for the second contributor was inconclusive. Bell's analysis of samples excised from the black Velcro shoes revealed DNA from a single source, Houck.

[¶15.]     Agent Spencer testified that he seized the pair of black Velcro tennis shoes from Krueger's personal belongings retained by the jail after Krueger's arrest and detention. Because the shoes were stained, Spencer explained that he sent the shoes to the state crime laboratory for testing, detailing the steps he took to package, seal, and document the evidence. A photograph of the shoes was admitted into evidence. However, the circuit court refused to admit the shoes after determining that Bell had testified only that she had analyzed samples taken from a pair of black Velcro shoes without identifying the particular shoes the State sought to introduce.

[¶16.]     The State's theory of the case was that Krueger lured Houck to Krueger's farm with the intent to kill him and had enlisted Vega's assistance. To support its theory, the State presented a detailed timeline of Krueger's separate communications with Vega, Goehring, and Houck, developed from a series of telephone calls and text messages. Included were texts from Krueger instructing Goehring to tell Houck he should come to Krueger's farm to collect money Houck claimed Goehring owed him. Krueger also texted Houck directly, asking when Houck would come to his farm to get the money. In another series of text messages, Krueger asked Vega whether he had purchased "40 rounds" of ammunition, followed by a subsequent message stating, "[S]howtime."

[¶17.]     Agent Spencer also testified about eight notes Krueger wrote while in pretrial custody. In one note intended for Vega, who was housed in the same jail, Krueger stated he had arranged for a lawyer to represent them and to "stay cool." The note also indicated, "There is no way we can say the exaxt [sic] same thing. . ." and encouraged Vega to "Hangtight." Another of Krueger's notes included a message to DCI agents and asked, "What lie to [sic] you tell Tony [Vega] You have wrong person. He didn't do it."

[¶18.]     At the close of the State's evidence, Krueger moved for judgment of acquittal, which the circuit court denied. The court also denied Krueger's motion to strike Bell's testimony regarding the DNA found on the black Velcro shoes. Krueger elected to rest without presenting any evidence. During closing argument, Krueger's attorney told the jurors that the State's evidence was too spare and left too many unanswered questions about the specifics of Houck's death due, in large part, to its failure to call Vega or Jankord as witnesses.

[¶19.]     During the State's closing rebuttal argument, the prosecutor responded to defense counsel's argument that individual jurors must be able to explain their verdict to the larger Huron community. In doing so, the prosecutor mentioned a private conversation with Houck's father, Don, who was not called as a witness, telling the jury, "[Don] says the defendant killed my boy. He killed my boy." Krueger objected claiming the argument was improper, and the circuit court sustained the objection. Krueger made no further objection and did not ask the court to strike the comment or instruct the jury to disregard it.

[¶20.] The jury returned a guilty verdict on the first-degree murder charge, and the circuit court imposed a mandatory life sentence. Krueger has identified five issues for our review, which we restate as follows:

1.  Whether the circuit court erred when it denied Krueger's motion for judgment of acquittal.

2.  Whether the circuit court abused its discretion when it denied Krueger's motion to change venue or committed plain error when it did not reconsider its ruling.

3.  Whether the circuit court abused its discretion when it refused to strike expert testimony regarding DNA recovered from the black Velcro shoes.

4.  Whether the circuit court committed error by failing to strike the State's comments during closing argument or issue a curative instruction.

5.  Whether the circuit court's cumulative errors deprived Krueger of a fair trial.

## Analysis and Decision

### *1. Whether the circuit court erred when it denied Krueger's motion for judgment of acquittal.*

[¶21.] "The denial of a motion for judgment of acquittal is a question of law we review de novo." *State v. Harruff*, 2020 S.D. 4, ¶ 15, 939 N.W.2d 20, 25. On appeal, we "decide anew whether the evidence was sufficient to sustain a conviction. In measuring evidentiary sufficiency, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Patterson*, 2017 S.D. 64, ¶ 27, 904 N.W.2d 43, 51 (quoting *State v. Thomason*, 2014 S.D. 18, ¶ 14, 845 N.W.2d 640, 643). "We accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict."

*Harruff*, 2020 S.D. 4, ¶ 15, 939 N.W.2d at 25 (quoting *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83). We "will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence." *Id.* (quoting *Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d at 83).

[¶22.] "Homicide is murder in the first degree . . . [i]f perpetrated without authority of law and with a premeditated design to effect the death of the person killed . . . ." SDCL 22-16-4(1). "Premeditated design to effect death" is defined by SDCL 22-16-5 as:

> an intention, purpose, or determination to kill or take the life of the person killed, distinctly formed and existing in the mind of the perpetrator before committing the act resulting in the death of the person killed. A premeditated design to effect death sufficient to constitute murder may be formed instantly before committing the act.

[¶23.] The circuit court correctly identified the elements of first-degree murder as: (1) The defendant caused the death of the victim; (2) The defendant did so with a premeditated design to effect the death; (3) The killing was not excusable or justifiable. SDCL 22-16-4(1). The court also instructed the jury that "[a] defendant may be found guilty of [m]urder . . . even if the defendant did not commit the act or acts constituting the crime but aided, abetted or advised in its commission." *See* SDCL 22-3-3 (providing criminal liability as a principal for those who aid and abet in the commission of a crime). The court further advised the jury that "[t]he mere presence alone of the defendant at the scene of a crime is not sufficient to make that person an aider and abettor[,]" but "[t]he presence of an accused at the scene of a crime, together with evidence of companionship and

conduct before and after the offense is committed, may warrant an inference of guilt."

[¶24.] Viewing the evidence in the light most favorable to the verdict, there is sufficient evidence to sustain Krueger's conviction for first-degree murder. The case against Krueger began rather dramatically when he and Goehring drove to Deputy Ball's home so that Krueger could confess to killing Houck. Unprompted by any investigation or suspicion by law enforcement officers, Krueger volunteered that he had killed Houck by hitting him with a baseball bat and had buried his body at his farm.

[¶25.] Agents executed a search warrant of Krueger's farm within hours and found Houck's body, which bore signs of a violent death. Nearby, they also recovered a baseball bat, which testing later revealed contained Houck's DNA. Dr. Snell confirmed that Houck had been killed by blunt force trauma inflicted to his head. Officers later discovered missing firearms from Houck's residence that were traced to Krueger and Vega.

[¶26.] Text messages between Krueger and Vega also point to a premeditated design to kill Houck. Krueger told Deputy Ball that he believed Houck was harassing members of his family, and the jury could have logically determined this tension is what motivated Krueger to murder Houck. The text messages support this view of the evidence and suggest a plan to lure Houck to Krueger's farm and murder him.[3]

---

3. Krueger's confession, with this degree of independent corroboration, is itself sufficient to sustain his conviction. *See State v. Plastow*, 2015 S.D. 100, ¶ 20,

[¶27.] Beyond this, Houck's DNA was found on Krueger's shoes. As indicated, Dr. Snell's testimony established that Houck had also sustained non-lethal blows that an assailant may have inflicted by kicking. Under the circumstances, the presence of the DNA evidence supports the reasonable inference that Krueger participated in Houck's murder. In this regard, it is not consequential whether he actually murdered Houck or personally inflicted the fatal blows. The jury was properly instructed that Krueger could also be found guilty as a principal under an aider and abettor theory and was further advised that Krueger's mere presence alone would not sustain a finding of guilt. *See State v. Schafer*, 297 N.W.2d 473, 477 (S.D. 1980) (approving jury instruction that provided "the mere presence alone of an accused at the scene of a crime is not sufficient to make him an aider and abett[o]r").

[¶28.] Krueger's arguments that there was no direct physical evidence connecting him to Houck's death, no eyewitnesses to the murder, and insufficient proof of anything other than Krueger's mere presence at the farm are not convincing. These claims are essentially an effort to relitigate the evidence and overlook our deferential standard for determining the sufficiency of the evidence. This well-established standard forbids us from reweighing evidence the jury has already considered and instead requires us to indulge every reasonable inference in

_____

(. . . continued)

873 N.W.2d 222, 229 (holding that the evidence is sufficient to sustain a conviction where the elements are established by "the defendant's corroborated confession or admission, independent evidence of the crime, or a combination thereof . . . .").

favor of the jury's verdict. Applying the correct standard, we conclude there is sufficient evidence to sustain Krueger's first-degree murder conviction.

> **2.    Whether the circuit court abused its discretion when it denied Krueger's motion to change venue or committed plain error when it did not reconsider its ruling.**

[¶29.]    A circuit court's determination of "[w]hether a change of venue should be granted is a matter within the sound discretion of [the court] and that decision will not be disturbed unless there is an abuse of discretion." *State v. Smith*, 477 N.W.2d 27, 32 (S.D. 1991). "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which on full consideration, is arbitrary or unreasonable.'" *State v. Delehoy*, 2019 S.D. 30, ¶ 22, 929 N.W.2d 103, 109 (quoting *Thurman v. CUNA Mut. Ins. Soc'y*, 2013 S.D. 63, ¶ 11, 836 N.W.2d 611, 616).

[¶30.]    "In a criminal case, a change of venue shall be ordered upon motion if the court is satisfied that there exists, in the county where the prosecution is pending, so great a prejudice against a defendant that he cannot obtain a fair and impartial trial in that county." *State v. Weatherford*, 416 N.W.2d 47, 50 (S.D. 1987) (citing SDCL 23A-17-5). "The test for change of venue is prejudice in the minds of the county residents sufficient to raise a reasonable apprehension that the accused will not receive a fair and impartial trial." *Smith*, 477 N.W.2d at 32. The burden rests upon the defendant to demonstrate he cannot receive a fair trial in a particular county, and "[t]he law presumes that a defendant can receive a fair trial in the county in which the offense is committed." *Weatherford*, 416 N.W.2d at 50.

[¶31.]     "Pretrial publicity alone is not enough to deny a fair trial or, to warrant a change of venue." *Smith*, 477 N.W.2d at 32. "There must be additional evidence tending to show that such publicity was so prejudicial as to prevent the defendant from receiving a fair and impartial trial in the county." *Id.* We have recognized that "voir dire examination is the better forum for ascertaining the existence of hostility towards the accused." *State v. Garza*, 1997 S.D. 54, ¶ 21, 563 N.W.2d 406, 410 (quoting *Boykin v. Leapley*, 471 N.W.2d 165, 168 (S.D. 1991)).

[¶32.]     Here, Krueger's motion for change of venue included seven articles published in the local Huron newspaper. There is no showing that this coverage was inaccurate, misleading, or inflammatory. *See State v. Reiman*, 284 N.W.2d 860, 867 (S.D. 1979) (discussing defendant's failure to show that pretrial publicity was prejudicial). One article actually included a quote from the state's attorney reminding readers "that the state has not proven anything in the case and that the defendant is presumed innocent and should be treated that way."

[¶33.]     After considering the parties' arguments, the circuit court denied the motion to transfer venue, although it indicated, "[W]e will take it up again after the Vega trial."[4] But when Vega elected to forego a trial and plead guilty to first-degree manslaughter, Krueger did not renew his motion, and the circuit court did not readdress the motion sua sponte. Krueger argues that the court erred first, by

---

4.     At the motion hearing, Krueger asked the circuit court to consider granting the motion "now" or holding it in abeyance until after the Vega trial. The State argues that Krueger abandoned the issue by allowing the motion to be held in abeyance. Our view of the record convinces us that the court did not hold the motion in abeyance, but rather denied the motion on its merits.

denying the motion and, second, by not unilaterally revisiting the issue "after the Vega trial." We will address the arguments separately.

[¶34.] First, we do not believe the circuit court abused its discretion by denying the motion to change venue. The motion was largely based upon the pretrial media coverage and the general allegation of the case's notoriety.[5] The handful of news articles contained in the record, however, do not support the idea that Krueger would be unable to obtain a trial by fair and impartial jurors. There is no allegation the reports are inaccurate or unnecessarily sensational, and we conclude they relate to a matter of public safety and community interest.

[¶35.] Nevertheless, voir dire examination is the best means to determine whether potential jurors have preconceptions they would be unable to set aside to render an impartial verdict. *See Garza*, 1997 S.D. 54, ¶ 21, 563 N.W.2d at 410. Here, the circuit court allowed a careful voir dire process over the course of two days. The court also utilized a comprehensive and specific juror questionnaire that asked prospective jurors a number of questions, including whether they had "heard or read anything about this case . . . ."

[¶36.] Through counsel, Krueger engaged in meaningful discussions with prospective jurors, and the individuals who were selected to serve as jurors indicated they could decide the case solely upon the evidence presented at trial. During the course of voir dire, Krueger challenged five prospective jurors for cause, and the circuit court ultimately granted each challenge and excused all five

---

5. The case was originally designated as a capital case, but the State later withdrew its notice to seek the death penalty.

individuals. In our view, Krueger has not identified any evidence from the record that would support a claim that he was unable to obtain a fair and impartial jury. Krueger points instead to aspects of the newspaper articles that recount details of the murder investigation and contain collateral allegations of drug trafficking. However, these facts do not render pervasive community prejudice self-evident, and the court's decision to deny a change of venue was within its discretion.

[¶37.]     Next, Krueger has not preserved his additional claim that the circuit court should have revisited the venue issue sua sponte. We view the court's statement about "tak[ing] [the venue issue] up again after the Vega trial" as an expression of its willingness to entertain a renewed motion to change venue after Vega's trial. Strictly speaking, this predicate never occurred because Vega admitted his guilt and did not have a jury trial with the corresponding level of media coverage and public interest. Regardless, if Krueger wanted to address his motion to transfer venue again, he should have renewed it to the circuit court. In the absence of such a request, our review is limited by the strictures of the plain error doctrine.

[¶38.]     "We invoke our discretion under the plain error rule cautiously and only in exceptional circumstances." *State v. McMillen*, 2019 S.D. 40, ¶ 13, 931 N.W.2d 725, 729 (quoting *State v. Bariteau*, 2016 S.D. 57, ¶ 24, 884 N.W.2d 169, 177). "To establish plain error, an appellant must show (1) error, (2) that is plain, (3) affecting substantial rights; and only then may this Court exercise its discretion to notice the error if, (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.,* 931 N.W.2d at 429-30 (quoting *State v.*

*Bausch*, 2017 S.D. 1, ¶ 27, 889 N.W.2d 404, 412). Here, Krueger has not identified a compulsory legal standard or any developments in the case after the motion to change venue was denied that would have required the circuit court to reconsider Krueger's venue motion again and change its earlier ruling. Accordingly, Krueger cannot demonstrate error, much less plain error.

> **3.** ***Whether the circuit court abused its discretion when it refused to strike expert testimony regarding DNA recovered from the black Velcro shoes.***

[¶39.]     Evidentiary rulings are reviewed for an abuse of discretion. *State v. Stone*, 2019 S.D. 18, ¶ 22, 925 N.W.2d 488, 497. We also review a circuit court's decision "to admit or deny an expert's testimony under the abuse of discretion standard." *State v. Kvasnicka*, 2013 S.D. 25, ¶ 18, 829 N.W.2d 123, 128 (quoting *State v. Lemler*, 2009 S.D. 86, ¶ 18, 774 N.W.2d 272, 278). "Under this standard, not only must error be demonstrated, but it must also be shown to be prejudicial." *Stone*, 2019 S.D. 18, ¶ 22, 925 N.W.2d at 497 (quoting *Bausch*, 2017 S.D. 1, ¶ 12, 889 N.W.2d at 408).

[¶40.]     Expert testimony is governed by SDCL 19-19-702, which provides that "[a] witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if . . . the testimony is based on sufficient facts or data." The basis of the expert's opinion may be derived from "facts or data that the expert has been made aware of or personally observed." SDCL 19-19-703. "[W]hile there must be some factual data to support the opinion of an expert, these facts need not be admissible in evidence to support the expert testimony." *Stormo v. Strong*, 469 N.W.2d 816, 820 (S.D. 1991).

[¶41.] Here, Krueger's challenge to the expert DNA opinions of forensic scientist Amber Bell does not implicate her methodology or the soundness of the scientific principles. Instead, Krueger's argument is based on the circuit court's subsequent decision not to admit the black Velcro shoes seized by Agent Spencer and attributed to Krueger. He reasons by implication that since the court determined the shoes were inadmissible, then Bell's testimony about samples taken from the shoes must necessarily be excluded. This proxy argument presumes that the circuit court correctly refused to admit the actual black Velcro shoes attributed to Krueger, but we believe the association he suggests between this ruling and the decision not to strike Bell's testimony is not determinative.

[¶42.] We can summarize the circuit court's two evidentiary rulings concerning the black Velcro shoes as follows:

> 1) The black Velcro shoes Agent Spencer seized were not admitted during this testimony because Bell "never identified those as the ones that she examined."
>
> 2) But there was, nevertheless, sufficient evidence contained in the broader trial record that allowed the court to conclude that Bell did, in fact, analyze samples taken from Krueger's shoes that were otherwise unchanged from their condition when Agent Spencer seized them. As the court explained, Bell did not "need to necessarily have the shoes present here for her to give her opinion."

[¶43.] We are not reviewing the court's first evidentiary ruling, which may or may not reflect a proper exercise of the court's discretion.[6] Nor do we believe its static nature compels the answer to the issue involving the second ruling, which implicates chain of custody principles. Instead, we are reviewing only the merits of

---

6. The State has not sought review of the circuit court's decision to exclude the shoes.

the court's refusal to strike Bell's expert DNA testimony using our well-established abuse of discretion standard. Insofar as the court's rationale for this specific decision is concerned, there was no abuse of discretion.

[¶44.] Circuit courts have "broad discretion in determining 'the competency of chain of custody evidence.'" *State v. Reay*, 2009 S.D. 10, ¶ 22, 762 N.W.2d 356, 363 (quoting *State v. Lownes*, 499 N.W.2d 896, 901 (S.D. 1993)). However, "a perfect chain of custody is not required." *State v. Shepard*, 2009 S.D. 50, ¶ 11, 768 N.W.2d 162, 165. "Rather, 'the trial judge must be satisfied in reasonable probability that the object sought to be admitted is the one involved in the case, and that it has not changed in important aspects.'" *Id.* (quoting *Reay*, 2009 S.D. 10, ¶ 22, 762 N.W.2d at 363).

[¶45.] Bell testified that Houck's DNA was found on samples taken from shoes she analyzed. Though her testimony may have been somewhat preliminary, Agent Spencer was the State's next witness, and he testified that he had seized Krueger's black Velcro shoes after he was booked into jail. The shoes appeared to be stained, possibly with blood, so he packaged them and requested that the state crime laboratory conduct serology and DNA testing. Spencer logged the shoes into an evidence-tracking system using a bar code that corresponded to Krueger's case and then physically transferred the evidence to laboratory personnel. Bell testified that the state crime laboratory uses the same system of tracking evidence. During testimony outside the presence of the jury, she also confirmed that she had viewed photographs of the shoes and observed the stains on them. A photograph of the

black Velcro shoes with visible stains was admitted during Spencer's testimony without objection.

[¶46.] Though the State's evidence relating to the chain of custody could have been presented in a clearer manner, we believe the evidence sufficiently established that Bell did, in fact, analyze Krueger's black Velcro shoes. Agent Spencer sent the shoes to the state crime laboratory for testing which, Bell explained, involved making cuts in the shoes to obtain material for sample swabs. Spencer also testified the shoes, altered as a result of the testing, were later returned to him with a label from the state crime laboratory. It appears only one pair of shoes was attributed to Krueger, and Bell testified that only one pair of shoes was tested for DNA. Krueger, for his part, did not challenge Bell's testimony regarding the shoes under a chain of custody theory until the circuit court denied the State's second request to admit the shoes.[7]

[¶47.] However, even without Bell's testimony, there was no discernible impact on the jury's verdict, and the error, if any, was harmless. The State's case

---

7. At trial, Krueger argued that Bell's DNA opinions regarding the shoes violated his right of confrontation because a different, non-testifying analyst had cut the fabric from the shoes to make the testing swabs, citing our decision in *State v. Medicine Eagle*, 2013 S.D. 60, 835 N.W.2d 886. He has abandoned the confrontation issue on appeal, and now claims that Bell's testimony should have been excluded because it was not relevant in the absence of her testimony that they belonged to Krueger. However, Krueger did not make a relevancy argument at trial, and his claim that Bell failed to sufficiently attribute the shoes to Krueger came after the close of the evidence in the form of a motion to strike Bell's testimony because "it hasn't been connected up." For this reason, we believe the evidentiary question here presents only the question whether Bell, in fact, analyzed Krueger's black Velcro shoes—not a question of relevancy.

against Krueger was strong. He confessed to killing Houck and told investigators they could find Houck's body at his farm where, in fact, the body was discovered. Krueger was motivated to kill Houck because of harassment he perceived Houck was inflicting upon members of Krueger's family, and text messages point specifically to a plan with Vega to kill Houck. Although Bell's DNA evidence placed Krueger in proximity to Houck perhaps at the time he was mortally injured, this is no more convincing than Krueger's own unsolicited confession.

### 4. Whether the circuit court committed error by failing to strike the State's comments during closing argument or issue a curative instruction.

[¶48.] "Prosecutorial misconduct implies a dishonest act or an attempt to persuade the jury by use of deception or by reprehensible methods." *Bariteau*, 2016 S.D. 57, ¶ 23, 884 N.W.2d at 177 (quoting *State v. Hayes*, 2014 S.D. 72, ¶ 23, 855 N.W.2d 668, 675). There are "no hard and fast rules [that] exist which state with certainty when prosecutorial misconduct reaches a level of prejudicial error which demands reversal of the conviction and a new trial; each case must be decided on its own facts." *McMillen*, 2019 S.D. 40, ¶ 27, 931 N.W.2d at 733 (quoting *State v. Stetter*, 513 N.W.2d 87, 90 (S.D. 1994)).

[¶49.] During the State's rebuttal closing argument, the prosecutor said:

> And the last thing I would say, I think [defense counsel is] absolutely right. Go out and explain it. And I think - - I know Don Houck. I met him over the last year and a half because of this . . . . He [sic] sitting in my office. He says the defendant killed my boy. He killed my boy.

Krueger's attorney objected stating, "I believe this is improper argument." The circuit court sustained the objection. The State then continued in its closing argument with no further comments regarding Don Houck. Krueger did not request

a curative instruction or ask the court to strike the prosecutor's comments about Houck's father.

[¶50.]     The State does not argue that the prosecutor's comments were proper, and we determine they were not.  Instead, the State claims that Krueger effectively prevailed on this issue before the circuit court because the court sustained his objection, and there was no further improper argument.  Implicit in the State's position is the question of whether Krueger forfeited his claim that the circuit court should have struck the prosecutor's comments or instructed jurors to disregard them by not asking for that relief.[8]  If the error was not preserved, we would review the argument for plain error rather than the abuse of discretion standard that otherwise guides our review of prosecutorial misconduct claims.  *See State v. Hayes*, 2014 S.D. 72, ¶ 22, 855 N.W.2d 668, 674-75 (citation omitted) ("The standard of review for prosecutorial misconduct claims is abuse of discretion.").

[¶51.]     However, whether Krueger's objection to the comment was sufficient to preserve the claim Krueger now raises on appeal has not been developed further in

---

8.     The circuit court's instructions conditioned the jury to expect that the attorneys would object during the testimony of witnesses and advised jurors that they should not "be influenced by [an] objection."  The court further explained that if it sustained an objection, jurors "must ignore the question, and must not try to guess what the answer might have been."  Although there is no similar instruction relating to objections sustained during the arguments of counsel, the court did instruct the jury that closing arguments were not evidence and that "statements of counsel not supported by evidence or a fair inference drawn therefrom should not be considered by you in arriving at your verdict."

the briefs, and we have not previously confronted the question.[9] Under the circumstances, we believe it is unnecessary to reach it here because the strength of the State's evidence and a close examination of the improper comment convinces us that it did not affect the jury's verdict under any standard of review. *See State v. Smith*, 1999 S.D. 83, ¶ 52, 599 N.W.2d 344, 355 (citation omitted) (holding prosecutorial misconduct is prejudicial when it "so infect[s] the trial with unfairness as to make the resulting convictions a denial of due process").

[¶52.]      Although the circuit court did not act sua sponte to strike the prosecutor's statement about Don Houck or instruct the jury to disregard it, the fact remains that the court did correctly sustain defense counsel's "improper argument" objection. At a minimum, therefore, the jurors were aware of the court's determination that the argument was not proper. The prosecutor, for his part, accepted the ruling, and there were no additional instances of improper argument.[10]

[¶53.]      We are aware that the prosecutor made the remarks about Don Houck during the State's rebuttal closing argument at a time when Krueger's attorney would not be able to respond. However, the prosecutor's improper comments, in

---

9.    At least one other court has addressed this issue and held that an objection to a prosecutor's improper closing argument does not preserve a claim that the trial court should have ordered the comment stricken and issued a curative instruction. *See State v. Patterson*, 482 S.E.2d 760, 766 (S.C. 1997).

10.   Krueger's reliance upon *Smith*, 1999 S.D. 83, 599 N.W.2d 344, is misplaced because the decision does little to assist his argument. Despite the fact the prosecutor in *Smith* made multiple improper comments during closing argument, the defendant could not obtain relief on appeal given the strength of the evidence against him. Here too, the prosecutor's isolated comment is insufficient to support a due process violation given the strength of the evidence.

context, were offered after restating a summary of the evidence as a response to defense counsel's rhetorical question about how jurors would explain the facts of the case to their "coworkers . . . and family members . . . ."

[¶54.] Beyond this, we do not understand how the comments attributed to Don Houck were fundamentally different from Krueger's own unsolicited statement to Deputy Ball that he had killed Houck with a baseball bat. Indeed, given the overwhelming evidence of guilt, we cannot accept Krueger's claim that the prosecutor's comments suggested Don Houck possessed other information to which the jury was not privy. Instead, the most logical interpretation of the prosecutor's comments about Don Houck is that Don believed Krueger was guilty based on the evidence outlined in the State's closing argument. We are similarly unpersuaded that the prosecutor's comments enflamed the jurors' passions by improperly engendering sympathy.

### 5. *Whether the circuit court's cumulative errors deprived Krueger of a fair trial.*

[¶55.] Based upon our determinations of the previous issues, we decline to address whether there was cumulative error. *See New v. Weber*, 1999 S.D. 125, ¶ 25, 600 N.W.2d 568, 577 ("Having found no one issue sufficient to declare [counsel's] representation deficient or prejudicial, we cannot now say that the sum of any errors requires a new trial.").

### Conclusion

[¶56.] Krueger's conviction is supported by sufficient evidence, and the circuit court's decisions to deny his request to strike the expert DNA testimony and his motion to change venue were not outside the range of permissible discretionary

choices.  Finally, the court's refusal to sua sponte strike the prosecutor's comment about Houck's father or issue a curative instruction does not constitute error under any standard of review.  We affirm.

[¶57.]        GILBERTSON, Chief Justice, and KERN, JENSEN, and DEVANEY, Justices, concur.