#30751-a-MES
**2025 S.D. 32**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

MICHAEL DAVID GEIST,                      Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT GUSINSKY
Judge

* * * *

L. ADAM BRYSON
Rapid City, South Dakota            Attorney for defendant and
                                    appellant.


MARTY J. JACKLEY
Attorney General

RENEE STELLAGHER
Assistant Attorney General
Pierre, South Dakota                Attorneys for plaintiff and
                                    appellee.

* * * *

CONSIDERED ON BRIEFS
APRIL 28, 2025
OPINION FILED **07/02/25**

#30751

SALTER, Justice

[¶1.]     Following a jury trial, Michael David Geist was convicted and sentenced for simple assault on a law enforcement officer and criminal trespass. Geist appeals, alleging the circuit court abused its discretion by admitting into evidence a recording from an officer's body camera under the silent witness theory. We affirm.

### Factual and Procedural Background

[¶2.]     Shortly after midnight on April 14, 2023, Officer Dalton Santana of the Rapid City Police Department responded to a report of a disruptive male patron at the Mount Rushmore Casino. Casino employee Dawn Hall had called 911 and reported that the individual was disturbing others and refused to leave.

[¶3.]     After he arrived, Officer Santana made contact with the subject of the complaint, a man who identified himself as Michael Geist. Footage from Officer Santana's body camera indicates Geist was irascible from the outset. During his initial interaction with Officer Santana, Geist was profane, and the two agreed to continue their conversation outside of the casino.

[¶4.]     Officer Santana quickly concluded Geist was under the influence of some type of substance.[1] Once outside, Officer Santana advised Geist he was going to transport him to an area detoxification center. Geist was not willing to walk to Officer Santana's patrol vehicle voluntarily and told the officer he would have to

---

1.    The source of Geist's impairment is not revealed in the record. He had an unopened bottle of liquor in his coat pocket, but it is unclear if alcohol use was the reason for his behavior. It is clear, however, from the unchallenged video footage of Geist's encounter with police officers on April 14 that he was highly agitated and confrontational.

-1-

walk him to the vehicle. As Officer Santana attempted to grab Geist's arm, Geist jerked his arm away resulting in what Officer Santana described as Geist pushing or shoving the officer's shoulder.

[¶5.] Officer Santana responded by performing an arm bar takedown, bringing Geist to the ground and subduing him. Around this point, a second officer, Officer Zachary Simons, arrived and assisted Officer Santana in handcuffing Geist and then standing him up on his feet. Geist was verbally abusive throughout, directing insults and threats at Officer Santana.

[¶6.] As the two officers began to place Geist into the back seat of Officer Santana's patrol vehicle, Geist was facing toward the officers with his back to the opened passenger-side rear door of the patrol vehicle. Geist continued to argue and insult Officer Santana, and the two officers attempted to ease him through the open vehicle door and into the rear seat. As Geist sat down in the back seat, he appeared to struggle with the officers as he moved his legs and feet into the patrol vehicle. During the interaction, Officer Santana can be heard on his body camera recording saying "Ow!" and stating that Geist had kicked him in the leg.

[¶7.] The incident was captured on two other video cameras in addition to Officer Santana's, though none of the recorded footage affords a clear view of the fateful kick. Perhaps the best view comes from the rearward-looking camera in Officer Santana's patrol vehicle. On it, Officer Santana can be seen in close proximity to Geist as the officer assisted him into the patrol vehicle. The recording shows Geist's legs appear to move forcefully outward as he gets into the vehicle in what could be perceived as a kick toward Officer Santana.

[¶8.]     The third video recording, and the one at the center of this appeal, is a short clip from Officer Simons's body camera which was actually not activated as Geist was being loaded into the patrol vehicle. However, after the officers had closed the rear passenger door, Officer Santana noticed that Officer Simons's body camera, though powered on, was not activated to record. Officer Santana reached over and turned it on by tapping a large button two times. The resulting footage from Officer Simons's camera recorded the events of the previous thirty seconds, including what Officer Santana claimed was evidence of Geist kicking him.[2]

[¶9.]     Geist was charged with two alternative counts of simple assault on a law enforcement officer[3] and criminal trespass. He waived his right to a preliminary hearing, was subsequently arraigned on the resulting information and entered a not guilty plea.

[¶10.]     Prior to trial, the State provided written notice of its intent to admit the first thirty seconds of Officer Simons's body camera footage.[4] The State indicated Officer Simons, who also serves in the military, was deployed to another country and unavailable to testify at trial. Because he could not provide testimony

---

2.     The previous thirty seconds are stored temporarily on the officers' body cameras and are recorded when the camera is activated, though without sound.

3.     Count 1 alleged Geist committed simple assault against Officer Santana under the theory that Geist attempted "to cause bodily injury" with "the actual ability to cause the injury[.]" *See* SDCL 22-18-1(1). The alternative charge in count 2 alleged Geist caused bodily injury to Officer Santana that did "not result in serious bodily injury." *See* SDCL 22-18-1(5).

4.     Though opinions may vary, *see supra* ¶ 7, the State believed Exhibit 4 offered "the best angle" of Geist's leg movement in the direction of Officer Santana.

to lay foundation for his body camera recording, the State proposed to introduce the video footage without his testimony using the silent witness theory of authentication.

[¶11.]     The State indicated, in this regard, that it would rely upon the testimony of James Chastain, a Rapid City Police Department video evidence technician specializing in video records and technology.  He is the custodian of records for video footage recorded by body cameras issued to the department's police officers.  The State argued there would be sufficient testimony to lay adequate foundation to admit the footage under the silent witness theory of authentication and to satisfy the requirements of SDCL 19-19-901.

[¶12.]     Geist submitted a written objection, and the circuit court heard arguments from both parties during a pretrial conference.  However, the court reserved its ruling and stated it would make a ruling "based upon the evidence provided at trial whether or not . . . a proper foundation is laid."

[¶13.]     A jury trial was held over two days.  Dawn Hall, Officer Santana, and James Chastain were each called as witnesses.  Officer Santana's body camera recording of the incident on April 14 was introduced as Exhibit 2 during his testimony, as was the patrol vehicle backseat video which was received as Exhibit 3.  Geist did not object to either.

[¶14.]     During Chastain's direct examination, the State moved to admit Officer Simons's body camera footage as Exhibit 4.  Geist objected, raising the same objection from the pretrial conference that there is a "difference between a body worn camera and [a] closed circuit security camera" and that it was not

"appropriate for an evidence technician to admit a body worn camera when he wasn't at the scene." The circuit court overruled the objection and admitted Officer Simons's body camera recording.

[¶15.] The jury found Geist guilty of both counts, opting for the simple assault theory stated in count 1 that Geist attempted to cause injury with the actual ability to do so. After a part II jury trial at which Geist was found to have been previously convicted of driving under the influence, third offense, the circuit court imposed an enhanced three-year prison sentence.

[¶16.] Geist appeals, arguing the circuit court abused its discretion when it admitted Officer Simons's body camera recording as Exhibit 4 under the silent witness theory.

## Analysis

### *Authentication of Officer Simons's body camera footage*

[¶17.] We review evidentiary rulings under an abuse of discretion standard. *State v. Belt,* 2024 S.D. 82, ¶ 20, 15 N.W.3d 732, 737 (citation omitted). An abuse of discretion is defined as a "fundamental error of judgment, a choice outside the range of permissible choices, a decision, which on full consideration, is arbitrary or unreasonable." *State v. Krueger*, 2020 S.D. 57, ¶ 29, 950 N.W.2d 664, 672 (quoting *State v. Delehoy*, 2019 S.D. 30, ¶ 22, 929 N.W.2d 103, 109). "In order to justify relief on appeal, an evidentiary error 'must also be shown to be prejudicial.'" *Belt*, 2024 S.D. 82, ¶ 20, 15 N.W.3d at 737 (quoting *Krueger*, 2020 S.D. 57, ¶ 39, 950 N.W.2d at 674).

[¶18.]     The fundamental rule for authenticating evidence is as practical as it is legal: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." SDCL 19-19-901(a). Oftentimes, the proponent can satisfy this standard by providing authenticating testimony from "a witness with knowledge . . . that an item is what it is claimed to be." SDCL 19-19-901(b)(1).

[¶19.]     As we explained in *State v. Reeves*, photographic or video evidence admitted in this way may be considered "merely illustrative of a witness' testimony[.]" 2021 S.D. 64, ¶ 15, 967 N.W.2d 144, 148 (citation omitted). And the evidence "only becomes admissible when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on that witness' personal observation." *Id.* (citation omitted). But this manner of authenticating photographic or video evidence is, by no means, exclusive.

[¶20.]     In *Reeves*, we endorsed a separate method of authentication which could, in some instances, be used to demonstrate that photographic or video evidence is what it purports to be—even in the absence of a witness who has personal knowledge of the content depicted. Under what is known as "the silent witness theory, a photograph or video" is not merely illustrative of a live witness's personal observation; it is "a silent witness which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness." *Id.* ¶ 15, 967 N.W.2d at 148–49.

[¶21.] The resulting rule we adopted in *Reeves* is a "flexible, fact-based" one. *Id.* ¶ 19, 967 N.W.2d at 150. "To authenticate a photograph or video under the silent witness theory, the proponent must present sufficient foundational facts to the circuit court so that the court, in its discretion, can determine that the trier of fact can reasonably infer that the subject matter is what its proponent claims." *Id.* ¶ 18 (cleaned up). This, after all, is the essence of authentication and "is ultimately consistent with the requirements of SDCL 19-19-901(a)." *Id.*

[¶22.] Here, the circuit court did not abuse its discretion when it admitted the thirty-second recording from Officer Simons's body camera. Chastain, in his role as the Rapid City Police Department's video evidence technology specialist, is also the Department's custodian of records. During direct examination, he described his familiarity and proficiency with the technical aspects of Officer Simons's body camera system, including how the cameras are activated and the Department's established procedures for each officer retrieving their assigned body camera which is fitted onto an officer's load-bearing tactical vest.

[¶23.] Chastain testified the body cameras can be manually activated by twice pushing a large button located on the front of an officer's vest. This correlates with Officer Santana's testimony and footage from his own body camera establishing that he activated Officer Simons's camera moments after loading Geist into the patrol vehicle by "reach[ing] over and hit[ting] it twice to turn it on." Chastain further explained that once activated, there is a thirty-second pre-buffer with video only, and no recorded audio. This is consistent with the quality and length of the clip from Officer Simons's body camera.

[¶24.]    Chastain also described how the footage from an officer's body camera is collected and stored. He explained the recording "remains on the camera until the officer gets back to the station" and places it in the docking station; then, "[f]rom that dock the evidence is securely transferred from the camera to [the Department's] cloud based storage where it resides for whatever appropriate categories are assigned to it for retention purposes." According to Chastain, no one can "alter, erase, duplicate, [or] copy" body camera footage after it is recorded.

[¶25.]    Chastain was also able to associate the video contained in Exhibit 4 to Officer Simons's camera. Specifically, Chastain's testimony linked the date and time of Officer Simons's reported interaction with Geist to the digital audit trail contained within Officer Simons's body camera recording. A digital watermark in the upper right corner of the video matched the serial number for the specific camera assigned to Officer Simons. And the date and time stamps on the video aligned with both the 911 call for service and the case report.[5]

[¶26.]    Even beyond the digital audit trail, there is additional evidence confirming the authenticity of Officer Simons's body camera footage admitted as Exhibit 4. Using the flexible, fact-based approach, the circuit court could also consider the fact that the genuineness of Exhibit 4 is supported by additional

---

5.    Curiously, the prosecutor asked Chastain if Officer Simons's body camera recording "appear[ed] to be a fair and accurate clip of Officer Simons' body cam from April 14, 2023?" Chastain was not, of course, at the scene when officers encountered Geist, and Chastain's affirmative answer is probably best viewed as an affirmation that the video recording marked as Exhibit 4 is the same DVD recording attributed to Officer Simons's body camera that Chastain watched and marked with his initials.

corresponding and, significantly, unchallenged evidence admitted before the State moved to admit Exhibit 4.

[¶27.] For example, Officer Santana's own body camera footage was admitted as Exhibit 2 without objection. It shows Officer Simons on the scene, assisting Officer Santana with Geist while all three men were in close physical proximity as the officers moved Geist from a handcuffed position on the ground into the back of Officer Santana's patrol vehicle.[6] In other words, the series of events captured on Officer Simons's *challenged* video footage are also the events shown on Officer Santana's *unchallenged* body camera recording, just from a slightly different viewing perspective.

[¶28.] The same is true for the rearward-looking camera recording from inside Officer Santana's patrol vehicle admitted as Exhibit 3. This evidence was also admitted without objection and shows the entire sequence of events as Geist is eased back into the rear seat of the patrol vehicle and eventually moves his feet and legs inside. It shows some degree of movement associated with his legs extending toward Officer Santana as he was assisting Geist into the vehicle.

[¶29.] Geist acknowledges our holding in *Reeves* but suggests that the rule concerning silent witness authentication is limited to stationary unmanned, or automated, surveillance cameras. However, Geist offers no authority for his argument, and, critically, our *Reeves* opinion contains no such restriction. Quite the

---

6.  Officer Simons was identified in Exhibit 2 by Officer Santana at trial and also by Officer Simons's name on his uniform which is plainly visible at various points.

opposite, in arriving at our flexible, fact-based approach, we cited with approval the New Hampshire Supreme Court decision in *State v. Stangle*:

> [I]t is not wise to establish specific foundational requirements for the admissibility of photographic [or video] evidence under the 'silent witness' theory, since *the context in which the evidence was obtained and its intended use at trial will be different in virtually every case.*

*Reeves*, 2021 S.D. 64, ¶ 17, 967 N.W.2d at 149 (second alteration in original) (emphasis added) (quoting *State v. Stangle*, 97 A.3d 634, 638 (N.H. 2014)).

[¶30.] Certainly, the silent witness theory is well-suited to photographs and recorded video footage from automated cameras, but it should not be viewed categorically as applying only to a group or narrow class of cases and no others. It is, instead, a rule that can be applied discretely in individual cases where a trial court finds the facts associated with the proffered evidence are sufficient to establish that the evidence is what it purports to be.

[¶31.] In a manner of speaking, authentication is authentication under any theory, and courts have applied the silent witness theory, or aspects of it, in other contexts not involving automated cameras. *See Wise v. State*, 26 N.E.3d 137, 141–43 (Ind. Ct. App. 2015) (applying silent witness theory to video recordings found in the defendant's possession); *Baez v. Commonwealth*, 893 S.E.2d 604, 615 (Va. Ct. App. 2023), aff'd, 909 S.E.2d 809 (Va. 2024) (concluding description of collection and storage of body camera footage, lack of gaps in time stamps appearing on body camera footage, and testimony "confirming the accuracy of . . . the events depicted in the video" from an officer who was also present was "sufficient to authenticate the video as a silent witness").

[¶32.] Under the circumstances, there was sufficient information for the circuit court to determine that Officer Simons's proffered body camera footage was what the State claimed it was, and there was no abuse of discretion. However, even if this was not the case, we perceive no prejudice from the admission of Exhibit 4.

[¶33.] In fact, Geist did not allege any prejudice resulting from the admission of Exhibit 4 in his principal brief, and our own review of the record leads us to conclude that the State's case was strong.[7] Officer Santana testified that Geist had kicked him which was consistent with his exclamation of "Ow!" on his body camera footage admitted as Exhibit 2, which, along with Exhibit 3, established Geist's hostile and threatening behavior before, during, and after the assault. And, beyond this, Officer Simons's body camera recording was *not* "smoking gun" evidence; it did not afford a clear view of a kick and, frankly, the other unchallenged video evidence, particularly Exhibit 3, was at least as illuminating on that question. For these reasons, even without the admission of Exhibit 4, we do not believe "the result of the proceeding would have been different." *State v. Fuller*, 2024 S.D. 72, ¶ 26, 14 N.W.3d 614, 622 (quoting *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686).

[¶34.] We affirm.

---

7. In response to the State's argument that he did not allege the existence of prejudice, Geist offers a brief, belated claim in his reply brief that he was prejudiced because the State emphasized Exhibit 4 in its closing argument by replaying it. We typically do not review issues raised for the first time in a reply brief, *State v. Washington*, 2024 S.D. 64, ¶ 44 n.4, 13 N.W.3d 492, 505 n.4, but, in any event, it does not appear that the State inordinately emphasized Exhibit 4 in its closing. In fact, the State replayed all three video recordings and acknowledged that none of them "show everything as clearly as we would hope but you can see Michael Geist moving his leg on Officer Simons' body camera and in the back seat camera right as he's getting into the patrol vehicle."

#30751

[¶35.]     JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN,

Justices, concur.