#30074-a-SPM
**2024 S.D. 73**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                     Plaintiff and Appellee,

v.

SCOTT MARTIN RUDLOFF,                      Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MICHELLE K. COMER
Judge

* * * *

JASON R. ADAMS of
Tschetter & Adams Law Office, P.C.
Sioux Falls, South Dakota          Attorneys for defendant and
                                   appellant.


MARTY J. JACKLEY
Attorney General

MATTHEW W. TEMPLAR
Assistant Attorney General
Pierre, South Dakota               Attorneys for plaintiff and
                                   appellee.

* * * *

ARGUED
AUGUST 30, 2023
OPINION FILED **12/11/24**

MYREN, Justice

[¶1.] Scott Rudloff appeals his conviction on three counts of first-degree rape of a minor under 13 years old. We affirm.

**Factual and Procedural History**

[¶2.] On November 11, 2019, in Beaverton, Oregon, Scott Rudloff and his adult stepson, Luke Volk, were involved in a verbal argument at the Rudloff family residence. Neighbors called law enforcement. When law enforcement arrived on the scene, they learned that Volk confronted Rudloff about an allegation that Rudloff had been sexually abusing Rudloff's stepdaughter, L.H., and daughter, L.R.[1] At that time, L.H. was 16 years old, and L.R. was 12 years old. L.H. had sent a message to Volk alleging that Rudloff had been raping her since she was five years old and had been raping L.R. as well.[2] L.H. disclosed her abuse after she saw Rudloff sexually assaulting L.R. Law enforcement interviewed Rudloff at the home. Rudloff spent the night at a hotel at the suggestion of law enforcement. Law enforcement also arranged for forensic interviews[3] of L.H. and L.R. The physical

---

1. Hillary Rudloff, Scott Rudloff's wife, is the mother of Volk, L.H., and L.R.

2. The family lived in Oregon at the time but had lived in South Dakota for several years before that. The charged conduct related to L.H. occurred in South Dakota.

3. Detective Anderson testified to what a forensic interview is:

> [T]here's an interview room and a medical evaluation room. They're separate. In the interview room, there's a table kind of with a bench set up in front of where the interviewer sits and the child sits. Directly in front of that is a large one-way mirror. . . . And then we have headphones that we listen to what's being said over that audio link. That interview's also

(continued . . .)

examination of L.H. showed no sign of sexual assault, but the physical examination of L.R. revealed an injury to her hymen.

[¶3.]     Law enforcement arrested Rudloff, and Detective Charles Anderson conducted the custodial interrogation after advising Rudloff of his *Miranda* rights. Rudloff verbalized that he understood them but did not state he was willing to waive them.  During the interview, Rudloff explained that there were "some questions that I'd probably won't want a lawyer with but I just want to know." Rudloff indicated that he wanted to call his brother.  Ultimately, Detective Anderson asked, "Is your brother an attorney?  Basically what I'm wondering is do we need to kill the recorder or."  Rudloff responded, "Yeah I'd like the recorder; I mean now I don't need to be recorded any longer, do I?"  After conversing back and forth, Detective Anderson told Rudloff, "So if you're seeking legal advice from your brother then I can shut the recorders down.  If you just want to talk to him and let him know what's going on."  Rudloff responded, "Well kind of let him know where I'm at and what's up and."

[¶4.]     After conversing some more, they had another exchange about speaking to his brother:

| | |
|---|---|
| Detective Anderson: | So again, did you want to - - I keep asking, do you want to talk to your brother? |
| Rudloff: | Um huh. |

_____

(. . . continued)

> digitally recorded, both audio and visual.  In addition to that, during the medical portion of the evaluation, they're in a different room where we can't see.  There's no video link and it's not video recorded because it's a physical exam of a child.

| | |
|---|---|
| Detective Anderson: | Okay.  Legal advice or just letting him know where you're at, what's going on? |
| Rudloff: | Legal advice so I can ask him - - |
| Detective Anderson: | Alright |
| Rudloff: | - - to get me an attorney and stuff like that.  I don't even know how to go about it out here man. |

Detective Anderson continued the interview, saying, "Okay.  So we're at a point where you've said a couple of things.  You want to talk to your brother about getting an attorney.  Okay." To which Rudloff responded, "Yeah I better."  Detective Anderson told Rudloff, "At that point - - that point it sounds like you're invoking to me."  Rudloff asked for clarification about what Detective Anderson meant, and he clarified, "That you're asking for an attorney.  Okay."  The following exchange then occurred:

| | |
|---|---|
| Detective Anderson: | I'd probably ask for an attorney myself. |
| Rudloff: | Exactly. |
| Detective Anderson: | But at that point you and I are doing [sic] talking.  Okay.  I can't - - I can't talk. |
| Rudloff: | What's me talking do any good for me? |
| Detective Anderson: | Well it depends.  If you're innocent it could do you an awful lot of good. |
| Rudloff: | I am innocent.  That's why I will talk if that's the case. |

| | |
|---|---|
| Detective Anderson: | Well, you've - - you've asked for an attorney so at this point I'm not really good going on here. Okay. |

Nevertheless, Detective Anderson continued the interview. Later in the interview, the subject of Rudloff's assertion of an attorney came up again:

| | |
|---|---|
| Detective Anderson: | I mean honestly, you know I'm still in a position where I'm not really comfortable questioning you. I mean – |
| Rudloff: | Comfortable questioning me? |
| Detective Anderson: | Well cause you keep asking for an attorney and then not; then going forward like you have - - |
| Rudloff: | I've had five hours of sleep yesterday. I might be on my game a little better. |
| Detective Anderson: | Alright. Well and; but that's the deal. I mean when - - when you start talking attorney, I start wanting to respect your rights and saying okay, that's fine. You're totally; I'm totally cool with you getting an attorney. I don't mind that at all. In fact depending on your financial situation, tomorrow morning they are going to have you fill out a form. And that form is basically you know do you need a court appointed attorney or - - |
| Rudloff: | Well |
| Detective Anderson: | - - are you going to hire your own? |

[¶5.] The interview continued, and Detective Anderson told Rudloff, "I'll be here as long as you need me to be here. But I don't want to start pressuring you" to which Rudloff replied, "Well you're not pressuring me. I mean I told you I didn't do it." The interview continued until Rudloff asked, "Can I call my brother now and

get some attorney advice?  I mean that's where I am with it man."  The interview

lasted about 38 minutes.

[¶6.]        On April 15, 2020, a grand jury indicted Rudloff on three counts of

rape in the first degree under SDCL 22-22-1(1) and 22-22-1.2(1).[4]  The following

day, the State filed a part II information alleging that Rudloff had a prior felony

conviction.

[¶7.]        Rudloff moved to suppress evidence from his "in-custody interrogation"

with Detective Anderson, "specifically, the video interview and transcript of

Defendant after the arrest in Oregon while being interrogated[,]" arguing it violated

his right to counsel.

[¶8.]        The circuit court issued an oral ruling at the end of the suppression

hearing.  It started by concluding that the interview was custodial, and Rudloff had

been advised of his *Miranda* rights.  The circuit court explained:

> The invocation of the right to counsel, if it's ambiguous, must be
> clarified before - - or excuse me - - should be clarified before
> proceeding, but if it appears only that the defendant might want
> an attorney, it does not require cessation of questioning, and the
> Court would rely upon State v. Blackburn, State v. Wright, and
> State v. Aesoph.  The Court finds that the State has met its
> burden of proof by a preponderance of the evidence based on the
> totality of the circumstances.

The circuit court stated, as it relates to Rudloff's assertion of his right to counsel,

"The most he says, the Court finds, is 'I know enough I should talk to a lawyer, but

I'm not worried, so here I sit.  I didn't want to retain an attorney yet.'"  The circuit

---

4.      There initially were more charges involving L.R. as a victim.  L.R. later
        admitted that she was never sexually touched in South Dakota and the State
        dismissed the charges related to her.

court found those statements to be "equivocal." The circuit court went further: "The Court finds that it appears that, at best, he might only want an attorney, but I'm not even sure about that." The circuit court then concluded that Rudloff's statements were "voluntarily given" and it denied the motion to suppress.

[¶9.]        On March 28, 2022, the case proceeded to a jury trial. Several witnesses testified: (1) L.H.; (2) Dr. Nicole Bishop-Perdue, M.D.; (3) L.R.; (4) Hillary Rudloff; (5) Ann Hazuka, Hillary's mother; (6) Detective Charles Anderson; (7) Jason de Neui; (8) Tifanie Petro; (9) Kali Lefebvre; (10) Kimberly Smith; (11) Paul Kindt; (12) Luke Volk; (13) Roger Hazuka, Hillary's father; (14) Joshua Skovlund; (15) Steven Small; and (16) Jennifer Eichstadt. Of particular consequence to this appeal are the testimonies of L.H., L.R., Dr. Bishop-Perdue, Hillary, Detective Anderson, and Kali Lefebvre. Both law enforcement interviews with Rudloff were admitted into evidence.

[¶10.]        L.H. gave detailed testimony of how Rudloff had routinely sexually touched her since she was five years old. She testified that Rudloff would touch her breasts with his fingers, hands, and mouth. She also testified how Rudloff would penetrate her vagina with his penis, mouth, and fingers. She said when he would penetrate her vagina with his penis, he would ejaculate either inside her vagina or anywhere on her body, including her backside or abdomen. She recalled that he would clean up the ejaculate with either clothes or a towel. L.H. detailed that sometimes she would, to no avail, resist by kicking or punching him. She remarked that Rudloff seemed to enjoy it when she resisted. L.H. also testified that Rudloff would show her pornography. She also detailed with specificity where the incidents

of sexual abuse would occur. L.H. did not realize these acts were wrong until she learned in fifth grade that she could become pregnant from sexual intercourse. She spent much of her time afterward worried that she was pregnant. L.H. did not disclose Rudloff's alleged sexual acts toward her because Rudloff indicated to her that if she told anyone, it might break up the family.

[¶11.] L.H. testified that the sexual abuse continued until one morning when L.H. saw L.R. lying fully nude on top of Rudloff, who was rubbing his penis against L.R.'s vagina. L.H. testified that after this encounter, she told Rudloff, "If I ever see you touching or are near my sister again, I'll call the cops and I'll tell Mom and you'll go to jail." Rudloff never sexually abused L.H. after this incident. Sometime later, L.H. peered into L.R.'s room and saw Rudloff masturbating. L.R. was under her comforter, and L.H. saw Rudloff reach his hand under the comforter a couple of times. L.H. convinced L.R. to tell their mother about their sexual abuse. Upon learning about the abuse, Hillary agreed to take the kids and move away. L.H. then sent a friend a message describing the situation and asked her to relay that message to her brother, Luke Volk.[5] This is when Volk confronted Rudloff, and law enforcement became involved.

[¶12.] L.R. gave testimony regarding the alleged sexual abuse she endured as well. Although not a charged victim, her testimony was admitted under SDCL 19-19-404(b) (Rule 404(b)) as other acts evidence tending to show a common plan or scheme of Rudloff's sexual abuse of these children. She testified that Rudloff began sexually abusing her when she was four or five years old. She testified that he

---

5. Volk was estranged from the family at this point, living elsewhere.

would remove both of their clothes and then touch her vagina with his penis or hands. Rudloff would penetrate her vagina with his fingers, and he would have L.R. stimulate his penis with her hands or mouth.[6] He would also show her video pornography from his phone before or after sexually abusing her. L.R. testified that she was in physical pain when Rudloff sexually abused her. L.R. did not realize that the sexual abuse was wrong until she watched a video about sexual assault in fifth grade. L.R. did not disclose the abuse for years for fear of being deemed a liar. L.R. recalled the event where Rudloff came into her room and took off his pants, and L.H. saw it happen. This is when L.H. and L.R. revealed to their mother the sexual abuse they were enduring.

[¶13.]    Dr. Nicole Bishop-Perdue testified about the medical exams she gave L.H. and L.R. as part of the forensic interview. She conducted a "head-to-toe comprehensive exam" of L.H. and L.R. to determine signs of sexual abuse; the exam included an inspection of the genital area. Dr Bishop-Perdue testified that L.H. showed no signs of sexual abuse[7] while L.R. had a "deep notch [on her hymen], which means that the tissue that was present in the rest of the area of the hymen

---

6.    On cross-examination, however, defense counsel noted that L.R. had told an interviewer for Child Abuse Response and Evaluation System that during the sexual abuse, nothing entered her mouth. During her testimony at trial, L.R. did not recall saying that.

7.    Dr. Bishop-Perdue testified that 80–90% of instances of child sexual abuse that are followed up with an exam within a couple days of the abuse have normal test results, showing no sign of sexual abuse.

was absent."[8] Dr. Bishop-Perdue testified that the deep notch in the hymen is "considered diagnostic of penetrating trauma[,]" which she described to mean that "some object has penetrated into the vagina past the hymen." Dr. Bishop-Perdue confirmed that her "medical exam [was] consistent with [L.R.'s] statement that a penis had been placed into her vagina." Dr. Bishop-Perdue later clarified that she did not "know what exactly caused the penetrating trauma. [She] just [knew] there's evidence that there was penetrating trauma." Dr. Bishop-Perdue also testified that she found erythema (which Dr. Bishop-Perdue described as redness indicative of irritation or swelling) on L.R.'s labial folds.

[¶14.]      Hillary testified about L.H. and L.R.'s disclosures of their sexual abuse to her. She testified about the day L.H. told her that Rudloff had been sexually abusing her since she was five years old. Hillary went to pick up L.H. from school, and L.H. had told her to bring L.R. as well. That is when L.H. told Hillary about the sexual abuse. Hillary told L.H. and L.R. to pack their bags and that they would tell the police the following day. Before the next day could arrive, Volk came over and confronted Rudloff, resulting in the arrival of law enforcement.

[¶15.]      On direct examination by the State, Hillary testified about whether L.H. and L.R. were telling the truth and whether Rudloff was guilty:

> Q:          - - if he didn't sexually assault them, then they
>             made up a story?
>
> A:          Right. Exactly. But they didn't make up a story.

---

8.     Dr. Bishop-Perdue testified that "the hymen is a small area of skin at the entrance of the vagina that usually sticks up in a small amount into the actual opening of the vagina."

Q: Okay. And if they didn't make up a story, that means your husband's guilty?

A: Right.

[Defense]: Objection.

The Court: Overruled.

[Defense]: Your Honor, just for the record, I would say that would invade the province of the jury as far as guilt or innocence, and putting forward a truth argument is not what the burden of proof is. It's whether or not the State has met its elements. They are not the finder of truth; they are the finder of fact.

The Court: You'll be instructed as to the law, which will be provided to you, but the facts are up to you to decide.

[¶16.] Later in the trial, Hillary was also called as a witness by the defense. On direct examination, Hillary agreed that she had previously told an investigator in October 2021 that she perceived that L.R. was telling a story so that her sister would not get in trouble. However, she testified, "At the time I felt that way, but now, knowing everything that I know, I don't feel that way."

[¶17.] On cross-examination, the State inquired:

Q: Ma'am, you indicated that you feel differently now than you did in the past?

A: Yes.

Q: What is it that's caused you to change your mind?

A: I received the documentation from Oregon stating everything that [L.R.] and [L.H.] said, and I never seen that before, and everything that they've said, right down to the penny, their story has not changed. When we went to Oregon and they sat with the lawyer and Detective Anderson, and I sat down and talked with him as well, they – it just clicked in my

> head that everything they have been telling me this whole time
> is the truth.
>
> Q:   So how does that make you feel – and please use the
> microphone – when you haven't been supportive?
>
> A:   It makes me feel like a terrible parent, a terrible mom.  I
> have terrible mom guilt because I didn't protect them and didn't
> believe in them at the time.
>
> Q:   You believe everything they say now?
>
> A:   Absolutely.

Rudloff did not object.

[¶18.]   Detective Anderson testified about his investigation of Rudloff. Detective Anderson became involved when patrol deputies who responded to the domestic disturbance informed him there may be more serious crimes.  When Detective Anderson arrived on the scene, L.H. told him that Rudloff had raped her for several years and that he had recently raped L.R.  Detective Anderson interviewed Rudloff outside of the residence, capturing it via an audio recording device.[9]  Detective Anderson's goal was to create what he described as a "safety plan" that involved persuading Rudloff to stay elsewhere for the night and to have forensic medical examinations conducted on L.H. and L.R.  Detective Anderson arranged for forensic interviews of L.H. and L.R. and was present at the forensic interviews.  The State asked Detective Anderson about L.R.'s interview:

> Q:       Can you give us a synopsis of what you learned?
>
> [Defense]:   Objections.  Calls for hearsay.
>
> The Court:   A synopsis is not.  Overruled.

---

9.   The audiotape recording was played for the jury.

A:    She talked about a number of instances of sexual abuse, including penile/vaginal penetration; digital penetration, putting his finger inside of her vagina. That that had occurred in several locations starting in Huron, South Dakota; Billings, Montana; and in Washington County, Oregon, in the house where she was currently living, and that it happened in the two bedrooms that she had there, both the bedroom she was currently in and the bedroom she had previously before Luke moved out. She said that it happened before and after her 12th birthday, which would have been a little bit less -- about six weeks prior.

[¶19.]    Detective Anderson also testified that he talked to Dr. Bishop-Perdue after she conducted the physical examination of L.H. and L.R. The following exchange occurred about what Dr. Bishop-Purdue told him.

Q:    And was there a finding of significance with one of these children?

A:    We didn't talk about it at the time, but it was reported out later. The important part that I talked to her after the evaluation had to do with as we're listening to the medical portion. There's a part where she's talking about, you know - -

[Defense]:    Objection. Hearsay and a narrative response.

The Court:    Well, with regard to hearsay, if it's - - Mr. Fitzgerald, is it to determine why he acted in the - -

[the State]:    Yes.

The Court:    Okay. I'll allow it.

A:    So there's a portion that we could hear over it where she touched [L.R.'s] vagina with a Q-tip, but I can't see where she's touching, so I followed up with her after the evaluation and said, "Where was that?" And she said that's where his penis touched and she said it was on the inside of the vagina.

[¶20.] Detective Anderson then testified about the 38-minute-long custodial interview he conducted with Rudloff after Rudloff was arrested. He discussed how Rudloff mentioned that his daughters would walk around the house naked. The videotaped interview was played for the jury.

[¶21.] Kali Lefebvre, a private investigator, testified as well. The State asked her about L.H. and L.R.'s motive to lie:

| | |
|---|---|
| State: | Would you agree that these children have no motive to make up a story? |
| [Defense]: | Objection. Calls for speculation. |
| The Court: | Overruled. She can answer based on her experience in this case. . . . |
| Lefebvre: | I am not sure. Based on the information that I gathered, I guess I couldn't say that. |

Rudloff attempted to inquire further about this testimony, but the circuit court sustained the State's objection.

[¶22.] During closing argument, the circuit court overruled Rudloff's objections to several statements made by the prosecutor: (1) "It's no wonder that [L.R.] has nightmares and she's depressed."; (2) "I know . . . you'll render a verdict that is just for all the people that are involved, and that's [L.H.] - -"; (3) "When you deliberate, search for the truth and not for doubt."; (4) "A guilty verdict is not going to erase what's happened here. It's not going to make everything perfect for everybody who's been impacted by the actions of this Defendant in this court, but a verdict will substitute justice for injustices that have been suffered[.]" The circuit court sustained Rudloff's objection to the prosecutor's request "[t]hat you'll render

justice for [L.H.] and that you'll render justice for the defendant in the case, and a guilty verdict on behalf of [L.H.]."

[¶23.]    The State also made a statement to which Rudloff did not object.  In its final remarks to the jury, the State argued that L.H. had "suffered abandonment, insensitivity from the mother who gave her birth, but she's been empowered to come here and stand up, face the person who sexually abused her as a child, and so your verdict can validate her courage, so thank you."

[¶24.]    The jury returned a guilty verdict on all three counts.  Rudloff admitted to the amended part II information.[10]  The circuit court sentenced Rudloff to 30 years of imprisonment on each count, with each to run consecutively.  Rudloff filed a timely appeal and raises several issues:

> 1.    Whether the circuit court erred in denying Rudloff's motion to suppress.
>
> 2.    Whether the circuit court abused its discretion by overruling Rudloff's objections on evidentiary matters.
>
> 3.    Whether the circuit court abused its discretion by denying Rudloff's motion for impeachment evidence regarding Hillary's 22-year-old false report of rape and kidnapping.
>
> 4.    Whether the circuit court abused its discretion or committed plain error by allowing alleged prosecutorial misconduct.
>
> 5.    Whether the cumulative effect of the circuit court's errors created prejudice that deprived Rudloff of a fair trial.

---

10.    After trial, the State filed an amended part II information alleging Rudloff had a prior conviction for attempted felony possession of marijuana.

**Decision**

### 1. *Whether the circuit court erred in denying Rudloff's motion to suppress.*

[¶25.] Rudloff moved to suppress his post-arrest custodial interview with Detective Anderson. The circuit court denied this request, reasoning that Rudloff was given *Miranda* warnings, he understood these warnings, and chose to continue answering questions voluntarily. Furthermore, the circuit court concluded that questioning could continue because Rudloff's references to procuring the assistance of a lawyer during the interview were ambiguous or equivocal.

[¶26.] "We review 'the denial of a motion to suppress based on the alleged violation of a constitutionally protected right as a question of law by applying the de novo standard of review.' We review any underlying factual findings of the circuit court 'under the clearly erroneous standard.'" *State v. Red Cloud*, 2022 S.D. 17, ¶ 21, 972 N.W.2d 517, 525–26 (citations omitted) (quoting *State v. Angle*, 2021 S.D. 21, ¶ 14, 958 N.W.2d 501, 506 and *State v. Doap Deng Chuol*, 2014 S.D. 33, ¶ 19, 849 N.W.2d 255, 261). "Under the de novo standard of review, no deference is given to the circuit court's conclusions of law." *Hauck v. Clay Cnty. Comm'n*, 2023 S.D. 43, ¶ 6, 994 N.W.2d 707, 710. "Clear error is shown only when, after a review of all the evidence, 'we are left with a definite and firm conviction that a mistake has been made.' The trial court's findings of fact are presumed correct and we defer to those findings unless the evidence clearly preponderates against them." *Parsley v. Parsley*, 2007 S.D. 58, ¶ 15, 734 N.W.2d 813, 817 ( (quoting *City of Deadwood v. Summit, Inc.*, 2000 S.D. 29, ¶ 9, 607 N.W.2d 22, 25).

[¶27.]    The recitation of *Miranda* rights in a custodial setting is a "'procedural safeguard[]' . . . to insure that the right against compulsory self-incrimination [is] protected." *Davis v. United States*, 512 U.S. 452, 457, 114 S. Ct. 2350, 2354, 129 L. Ed. 2d 362 (1994) (citation omitted). "The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions." *Berghuis v. Thompkins*, 560 U.S. 370, 387, 130 S. Ct. 2250, 2263, 176 L. Ed. 2d 1098 (2010). "The accused must be informed 'that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *State v. Blackburn*, 2009 S.D. 37, ¶ 9, 766 N.W.2d 177, 181 (citation omitted). Thereafter, "the government must prove [by a preponderance of the evidence] that the accused knowingly and intelligently waived the right to counsel and the privilege against self-incrimination." *Id.* (citation omitted).

[¶28.]    "A waiver [of *Miranda* rights] need not be explicit, but '[t]o prove a valid waiver, the State must show that (1) the relinquishment of the defendant's rights was voluntary and (2) the defendant was fully aware that those rights were being waived and of the consequences of waiving them.'" *State v. Larson*, 2022 S.D. 58, ¶ 26, 980 N.W.2d 922, 930 (alterations in original) (quoting *State v. Two Hearts*, 2019 S.D. 17, ¶ 21, 925 N.W.2d 503, 512). "A court examines the totality of the circumstances when considering whether a valid waiver has taken place, such as 'a defendant's age, experience, intelligence, and background, including familiarity with the criminal justice system, as well as physical and mental condition.'" *Id.*

¶ 27 (citation omitted). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384, 130 S. Ct. at 2262.

[¶29.]   That being the case, "[a]ny waiver, express or implied, may be contradicted by an invocation at any time. If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease." *Id.* at 387–88, 130 S. Ct. at 2263–64. However, "[a] person subjected to custodial interrogation must invoke the right to counsel 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Blackburn*, 2009 S.D. 37, ¶ 11, 766 N.W.2d at 182 (citation omitted). "[I]f a suspect makes a [post-waiver] reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning."[11] *Id.*

[¶30.]   The record reveals that Rudloff impliedly waived his *Miranda* rights. After being taken into custody, Detective Anderson advised Rudloff of each of his *Miranda* rights. In response, Rudloff verbalized that he understood them. After this exchange, Rudloff was given an adequate opportunity to invoke his rights but

---

11.   Compare the rule for *post*-waiver ambiguous or equivocal invocations of the right to counsel and right to remain silent with the rule for *pre*-waiver ambiguous or equivocal invocations of the same rights. We have held "that in a pre-waiver situation where the accused has *not yet validly waived* the *Miranda* rights, the officers must clarify the waiver before proceeding with the interview." *Blackburn*, 2009 S.D. 37, ¶ 12, 766 N.W.2d at 182.

did not do so. Instead, he decided to begin talking willingly and without prompting. In other words, Rudloff's statements after being given his *Miranda* warnings were uncoerced. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384, 130 S. Ct. at 2262. Because Rudloff was given a *Miranda* warning, explained that he understood it, and voluntarily chose to talk, he impliedly waived his right to counsel and to remain silent.

[¶31.] After waiving his *Miranda* rights, Rudloff did not unequivocally invoke his right to counsel. On several occasions, Rudloff mentioned contacting an attorney. However, none of these references were sufficiently clear to be considered an invocation of the right to counsel. To invoke his right to counsel, Rudloff needed to state his intention clearly enough "'that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Blackburn*, 2009 S.D. 37, ¶ 11, 766 N.W.2d at 182 (citation omitted). The record indicates that Rudloff's post-waiver references to an attorney were, at best, ambiguous and did not effectively invoke his right to counsel. Because Rudloff waived his *Miranda* rights and did not thereafter effectively invoke his right to counsel, the circuit court did not err when it denied his motion to suppress.

> **2. *Whether the circuit court abused its discretion by overruling Rudloff's objections on evidentiary matters.***

[¶32.] The standard for reviewing the circuit court's evidentiary rulings is well settled:

> Evidentiary rulings are reviewed for abuse of discretion. An abuse of discretion is "a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration is arbitrary or unreasonable." Under the abuse of discretion standard, "not only must error be demonstrated, but it must also be shown to be prejudicial."

*State v. Harruff*, 2020 S.D. 4, ¶ 14, 939 N.W.2d 20, 25 (citations omitted) (quoting *State v. Stone*, 2019 S.D. 18, ¶ 22, 925 N.W.2d 488, 497). "Where error has not been preserved by objection or otherwise, our inquiry is limited to whether the court committed plain error." *State v. Selalla*, 2008 S.D. 3, ¶ 18, 744 N.W.2d 802, 807.

> To establish plain error, an appellant must show "(1) error, (2) that is plain, (3) affecting substantial rights; and only then may this Court exercise its discretion to notice the error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." Additionally, "[w]ith plain error analysis, the defendant bears the burden of showing the error was prejudicial."

*State v. Greenwood*, 2016 S.D. 81, ¶ 16, 887 N.W.2d 726, 729 (alteration in original) (citation omitted) (quoting *State v. Beck*, 2010 S.D. 52, ¶ 10, 785 N.W.2d 288, 293).

### a.　*Hillary Rudloff's testimony*

[¶33.]　Rudloff argues that the circuit court's decision to allow Hillary's testimony was an abuse of discretion. Specifically, he argues that Hillary bolstered the testimony of L.H. and L.R. and commented on Rudloff's guilt. He contends this occurred in the two following exchanges:

> State:　- - if he didn't sexually assault them, then they made up a story?
>
> Hillary:　Right. Exactly. But they didn't make up a story.
>
> State:　Okay. And if they didn't make up a story, that means your husband's guilty?
>
> Hillary:　Right.

Rudloff objected to that exchange but did not object to this second exchange:

> State: You believe everything they [i.e., L.H. and L.R.] say now?
>
> Hillary: Absolutely.

[¶34.] "'One witness may not testify as to another witness'[s] credibility or truth-telling capacity because such testimony would invade the exclusive province of the jury to determine the credibility of a witness.'" *State v. Packed*, 2007 S.D. 75, ¶ 37, 736 N.W.2d 851, 862 (alteration in original) (quoting *State v. McKinney*, 2005 S.D. 73, ¶ 32, 699 N.W.2d 471, 481). In *State v. Raymond*, the "State directly asked [an expert witness] for her opinion as to victim's credibility." 540 N.W.2d 407, 409 (S.D. 1995). Given this fact, this Court concluded, "[t]here is substantial risk that the jury did not use its own common sense when they determined the credibility of victim." *Id.* at 410.

[¶35.] In the first question of the first exchange, the prosecutor did not ask Hillary to give any opinion as to the victim's credibility. Instead, he asked her a question of logic: if Rudloff did not sexually abuse the girls, their claims must be a made-up story. But she did not answer the logic question. Instead, Hillary stated her opinion that the girls did not make up a story. In giving that answer, Hillary implicitly stated that she believed her daughters were telling the truth. The prosecutor next asked, "if they didn't make up a story, that means Husband's guilty." Hillary agreed. Rudloff objected, and the circuit court overruled the objection. Given the nature of the answer, that was an abuse of the circuit court's discretion.

[¶36.]     Rudloff did not object to the second inquiry ("You believe everything they say now?"). This dialogue occurred during the State's cross-examination of Hillary after the defense had elicited this same information during direct examination. In these circumstances, it was not error for the circuit court not to intervene.

[¶37.]     Based on the entirety of the evidence presented, we are unconvinced that the erroneous admission of Hillary's testimony in the first exchange resulted in reversible prejudice.

### b.    *Detective Anderson's testimony regarding Dr. Bishop-Perdue's comments*

[¶38.]     Rudloff argues that the circuit court abused its discretion when it admitted testimony by Detective Anderson relating out-of-court statements made to him by Dr. Bishop-Perdue over Rudloff's objection:

| Q: | And was there a finding of significance with one of these children? |
|---|---|
| A: | We didn't talk about it at the time, but it was reported out later. The important part that I talked to her after the evaluation had to do with as we're listening to the medical portion. There's a part where she's talking about, you know - - |
| [Defense]: | Objection. Hearsay and a narrative response. |
| The Court: | Well, with regard to hearsay, if it's - - Mr. Fitzgerald, is it to determine why he acted in the - - |
| [the State]: | yes. |
| The Court: | Okay. I'll allow it. |
| A: | So there's a portion that we could hear over it where she touched [L.R.'s] vagina with a Q-tip, but I can't see where she's touching, so I followed up |

> with her after the evaluation and said, "Where was that?" And she said that's where *his penis* touched and she said it was on the inside of the vagina.

(Emphasis added.)

[¶39.]     Rudloff also claims the circuit court abused its discretion when it failed to sustain his objection to Detective Anderson's synopsis of L.R.'s interview:

| | |
|---|---|
| Q: | Can you give us a synopsis of what you learned? |
| [Defense]: | Objections. Calls for hearsay. |
| The Court: | A synopsis is not. Overruled. |
| A: | She talked about a number of instances of sexual abuse, including penile/vaginal penetration; digital penetration, putting his finger inside of her vagina. That that had occurred in several locations starting in Huron, South Dakota; Billings, Montana; and in Washington County, Oregon, in the house where she was currently living, and that it happened in the two bedrooms that she had there, both the bedroom she was currently in and the bedroom she had previously before Luke moved out. She said that it happened before and after her 12th birthday, which would have been a little bit less -- about six weeks prior. |

[¶40.]     "Hearsay is 'a statement that: (1) [t]he declarant does not make while testifying at the current trial or hearing; and (2) [a] party offers in evidence to prove the truth of the matter asserted in the statement.'" *State v. Hankins*, 2022 S.D. 67, ¶ 23, 982 N.W.2d 21, 31 (alterations in original) (quoting SDCL 19-19-801(c)). Hearsay is inadmissible unless an exception applies. SDCL 19-19-802.[12]

---

12.   SDCL 19-19-802 provides:

> Hearsay is not admissible unless any of the following provide otherwise:

(continued . . .)

[¶41.]     L.R., L.H., and Dr. Bishop-Purdue testified before the jury heard testimony from Detective Anderson.  It was in this context that Detective Anderson was asked to summarize L.R.'s interview.  It appears the circuit court allowed this summary of what he heard to explain why the detective proceeded to arrest Rudloff.  When viewed in this context, the circuit court's evidentiary decision was not an abuse of its discretion.

[¶42.]     Detective Anderson also testified that Dr. Bishop-Purdue told him that the medical exam revealed an injury to L.R.'s hymen where Rudloff's penis touched it.  Rudloff did not independently object to Detective Anderson's testimony relating of out-of-court statements he claims Dr. Bishop-Purdue made to him.  Consequently, any alleged error in allowing this testimony would be reviewed for plain error.  When a reviewing court assesses plain error in the context of an evidentiary decision, "the question before us is *not* whether the trial court erred in admitting the testimony, because the court was not given the opportunity to make that decision.  Instead, the precise question before us is whether the trial court's failure to sua sponte strike the testimony or to provide a cautionary instruction constituted plain error." *State v. Vick*, 632 N.W.2d 676, 685 (Minn. 2001).

[¶43.]     Dr. Bishop-Purdue had already testified, and the court and jury heard her precise explanation of the results of her examination.  While Detective Anderson's recitation of what Dr. Bishop-Purdue told him was not perfectly

---

(. . . continued)

      (1) A statute;
      (2) These rules; or
      (3) Other rules prescribed by the Supreme Court.

consistent with her trial testimony, it did not deviate to such an extent that it imposed a duty on the court to intervene. Consequently, the circuit court did not err when it did not intervene.

### c. Kali Lefebvre's testimony regarding L.R. and L.H.'s lack of motive to lie

[¶44.] Rudloff objected when the State asked Lefebvre whether the girls had any motivation to lie. The circuit court overruled the objection and allowed Lefebvre to answer. Ultimately, she offered no opinions as to the girls' motivations. When Rudloff attempted to inquire further with Lefebvre about the girls' motivations, the court sustained the State's objection. Rudloff claims this was an abuse of the court's discretion but offers no explanation of how either ruling prejudiced his case. Even if we were to find an abuse of discretion in allowing the question, because Lefebvre gave no opinion as to the girls' motivations, there was undoubtedly no prejudice to Rudloff's defense.

### 3. Whether the circuit court abused its discretion by denying Rudloff's motion for impeachment evidence regarding Hillary's 22-year-old false report of rape and kidnapping.

[¶45.] Over 22 years ago, Hillary was convicted for false reporting of rape and kidnapping. Rudloff filed a notice of intent to offer other act evidence and impeachment evidence, citing Rule 404(b) and SDCL 19-19-609. At a hearing on the notice of intent, the State argued the incident and conviction were too remote in time. Rudloff argued that remoteness was not a factor. He claimed the information was highly relevant because of the "amount of deceit that [Hillary] put forward to

law enforcement[.]" He contended that it "goes to the motive and opportunity and planning and knowledge." The circuit court explained:

> I don't see how it's relevant to this case at all. She's not the accusing party and remoteness is a huge factor based on the case law and the statute itself. It says, "The trial court should especially scrutinize evidence of prior convictions offered for impeachment purposes where such convictions are over 10 years old, keeping in mind the principle that basic to use – the basic principle to the use of prior convictions for impeachment is the requirement that the conviction not be too remote in time." This is 22 years old, almost 23 years old. She's not the accusing party.

Rudloff again argued that the conviction would also "qualify under other acts, but also impeachment." Following further discussion of the application of SDCL 19-19-609, the circuit court provided the following ruling:

> The Court's reviewed the evidence. It shows that, if anything, she has denied that these events even happened to her daughters and certainly, at least from the Court's information, has not been – coaching has not been – any evidence of coaching whatsoever has not been provided. In fact, the opposite is true. She has tried to – I don't want to use the word obstruct in a legal sense, but keep family members from having contact with the children because she, in fact, doesn't believe this happened. So I don't know. She's not a credible witness in my opinion either way, but the Court finds it's too remote to leave it in and the Court finds that the prejudice of this would be – it is obvious and that it would be confusing to the jury. It would have a significant impact on the jury and I think it's confusing as to who's on trial here and who to believe, so the Court's going to deny that, but your objection is noted.

#30074

[¶46.]     SDCL 19-19-609[13] authorizes the admission of evidence of a

witness's conviction of a felony or *crimen falsi* (i.e., a crime that involves a

---

13.     SDCL 19-19-609 provides:

(a) In general.  The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:
     (1) For a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:
          (A) Must be admitted, subject to § 19-19-403, in a civil case or in a criminal case in which the witness is not a defendant; and
          (B) Must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant; and
     (2) For any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving--or the witness's admitting--a dishonest act or false statement.
(b) Limit on using the evidence after 10 years.  This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later.  Evidence of the conviction is admissible only if:
     (1) Its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and
     (2) The proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.
(c) Effect of a pardon, annulment, or certificate of rehabilitation.  Evidence of a conviction is not admissible under subdivision (a) or (b) if:
     (1) The conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure based on a finding that the person has been rehabilitated, and the person has not been convicted of a later crime punishable by death or by imprisonment for more than one year; or
     (2) The conviction has been the subject of a pardon, annulment, or other equivalent procedure based on a finding of innocence.
(continued . . .)

dishonest act or false statement as part of an element for conviction) if it has occurred within ten years. However, "if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later[,]" then the "[e]vidence of the conviction is admissible only if: (1) Its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and (2) The proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." SDCL 19-19-609(b).

[¶47.]     Rule 404(b) authorizes the use of other act evidence in certain circumstances.[14] "Prior to admitting [other act] evidence, the circuit court must

_____

(. . . continued)

>(d) Juvenile adjudications. Evidence of a juvenile adjudication is admissible under subdivision (a) only if:
>>(1) It is offered in a criminal case;
>>(2) The adjudication was of a witness other than the defendant;
>>(3) An adult's conviction for that offense would be admissible to attack the adult's credibility; and
>>(4) Admitting the evidence is necessary to fairly determine guilt or innocence.
>
>(e) Pendency of an appeal. A conviction that satisfies this rule is admissible even if an appeal is pending. Evidence of the pendency is also admissible.

14.     SDCL 19-19-404 provides:

>**(a) Character evidence.**
>>(1) Prohibited uses. Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.
>>(2) Exceptions for a defendant or victim in a criminal case. The following exceptions apply in a criminal case:

(continued . . .)

determine whether the evidence is relevant to a material issue other than character and whether its probative value is substantially outweighed by the danger of unfair prejudice." *State v. Evans*, 2021 S.D. 12, ¶ 25, 956 N.W.2d 68, 79 (citing *State v. Boe*, 2014 S.D. 29, ¶ 20, 847 N.W.2d 315, 320).

[¶48.]     The circuit court was principally focused on the application of SDCL 19-19-609 and determined that Hillary's conviction had no probative value. After

_____

(. . . continued)

(A) A defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it;
(B) Subject to the limitations in § 19-19-412, a defendant may offer evidence of an alleged victim's pertinent trait, and if the evidence is admitted, the prosecutor may:
    (i) Offer evidence to rebut it; and
    (ii) Offer evidence of the defendant's same trait; and
(C) In a homicide case, the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor.
(3) Exceptions for a witness. Evidence of a witness's character may be admitted under §§ 19-19-607 to 19-19-609, inclusive.
**(b) Other crimes, wrongs, or acts.**
(1) Prohibited uses. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
(2) Permitted uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.
(3) Notice in a criminal case. In a criminal case, the prosecutor must:
    (A) Provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it;
    (B) Articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose; and
    (C) Do so in writing before trial--or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

considering the danger of confusing the jury with this evidence, the court determined the probative value did not outweigh the unfair prejudicial effect.

[¶49.]        The circuit court did not expressly address SDCL 19-19-404. Analysis under that rule requires the court to look at the "acts" in question. In these circumstances, the "acts" were the conduct that led to Hillary's conviction for false reporting. The underlying "acts" were equally remote in time, were similarly of doubtful relevance, and carried the same dangers of confusing the jury expressed by the circuit court in its ruling on the application of SDCL 19-19-609. If the court had determined the "acts" fell within the permitted uses of Rule 404(b)(2),[15] it would have still needed to determine whether the probative value of the "acts" was substantially outweighed by the danger of unfair prejudice. The court tangentially addressed this weighing analysis when it expressed "that the prejudicial effect of her lies being used against her daughters in court, and the fact that this is very remote in time, the Court's not going to allow it."

[¶50.]        Under each rule, the standard of review is the same—abuse of discretion. *See Harruff*, 2020 S.D. 4, ¶ 14, 939 N.W.2d at 25 ("Evidentiary rulings are reviewed for abuse of discretion." (citing *Stone*, 2019 S.D. 18, ¶ 22, 925 N.W.2d at 497)); *State v. Patterson*, 2017 S.D. 64, ¶ 12, 904 N.W.2d 43, 48 ("We review a circuit court's decision to admit other acts evidence under the abuse of discretion standard." (citing *State v. Toohey*, 2012 S.D. 51, ¶ 11, 816 N.W.2d 120, 127)); *State*

---

15.    Rudloff claims the "acts" were offered "to prove 'motive, and opportunity and planning and knowledge.'" The circuit court did not provide any "permitted use" analysis under Rule 404(b).

*v. Dickson*, 329 N.W.2d 630, 633 (S.D. 1983) (Because impeachment by criminal conviction "rulings are discretionary with the trial court, the standard of review is that an 'abuse of discretion' is required for reversible error." (citing *State v. Sahlie*, 90 S.D. 682, 245 N.W.2d 476 (1976))).

[¶51.] Rudloff argues that "[t]he other acts evidence was sought to establish the motive for why L.H. and L.R. would fabricate the allegations against Rudloff." Hillary's false reporting of rape conviction occurred over twenty years before the trial. Hillary is not the victim but rather the mother of the victims. Rudloff offered no evidence to suggest that there is any link between Hillary's conviction for false reporting and her daughters' allegations of sexual abuse by Rudloff. That conviction does not make it any more or less likely that L.H. and L.R. lied. Furthermore, as the circuit court noted, Hillary did not initially believe L.H. and L.R. were telling the truth, which is inconsistent with Rudloff's theory that Hillary coached her daughters into making false claims against Rudloff. The circuit court noted that Rudloff had not presented any information suggesting that such coaching occurred. The circuit court did not abuse its discretion when it excluded evidence of Hillary's 22-year-old conviction for false reporting.

> **4. Whether the circuit court abused its discretion or committed plain error by allowing alleged prosecutorial misconduct.**

[¶52.] During closing argument, the circuit court overruled Rudloff's objections to several statements made by the prosecutor: (1) "It's no wonder that [L.R.] has nightmares and she's depressed."; (2) "I know . . . you'll render a verdict that is just for all the people that are involved, and that's [L.H.] - -"; (3) "When you

deliberate, search for the truth and not for doubt."; (4) "A guilty verdict is not going to erase what's happened here. It's not going to make everything perfect for everybody who's been impacted by the actions of this Defendant in this court, but a verdict will substitute justice for injustices that have been suffered[.]"

[¶53.] The State also made a statement to which Rudloff did not object. In its final remarks to the jury, the State argued that L.H. had "suffered abandonment, insensitivity from the mother who gave her birth, but she's been empowered to come here and stand up, face the person who sexually abused her as a child, and so your verdict can validate her courage, so thank you."

[¶54.] "'Prosecutorial misconduct implies a dishonest act or an attempt to persuade the jury by use of deception or by reprehensible methods.' 'When misconduct occurs, "we will reverse the conviction only if the misconduct has prejudiced the party as to deny him or her a fair trial."'" *Patterson*, 2017 S.D. 64, ¶ 18, 904 N.W.2d at 49–50 (citation omitted) (quoting *State v. Pursley*, 2016 S.D. 41, ¶ 10, 879 N.W.2d 757, 760).

[¶55.] "It is well established . . . that the prosecutor and the defense have considerable latitude in closing arguments, for neither is required to make a colorless argument." Counsel has a right to discuss the evidence and inferences and deductions generated from the evidence presented. However, our cases have held fast to the idea that "[t]he prosecutor has an overriding obligation, which is shared with the court, to see that the defendant receives a fair trial."

*State v. Smith*, 1999 S.D. 83, ¶ 42, 599 N.W.2d 344, 353 (alteration and omission in original) (citations omitted) (quoting *State v. Blaine*, 427 N.W.2d 113, 115 (S.D. 1988)).

[¶56.]    "If an issue of prosecutorial misconduct is preserved with a timely objection at trial, [this Court will] review the trial court's ruling under the standard of abuse of discretion.  However, if an issue of prosecutorial misconduct is not properly preserved for appeal, this Court will analyze the claim under plain error." *State v. Hayes*, 2014 S.D. 72, ¶ 24, 855 N.W.2d 668, 675 (alteration in original) (quoting *Beck*, 2010 S.D. 52, ¶ 10, 785 N.W.2d at 293).

[¶57.]    The prosecutor's statements during the closing argument were within the bounds of fair argument.  Consequently, the circuit court did not abuse its discretion by overruling Rudloff's objections to the prosecutor's statements in closing argument.  Similarly, the circuit court did not commit plain error by not intervening in response to the statements to which no objection was raised.

[¶58.]    Given our holdings on the individual issues above, we need not address Rudloff's assertion that he suffered prejudice because of the cumulative effect of multiple errors.  We affirm.

[¶59.]    JENSEN, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.